B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|
| | 14 au 65511 |

**PLAINTIFFS**

Cheree Newson Pace

New Columbia Residential, Columbia Residential Property Managers, Columbia-MRA Park City Place, LLC, New Affordable HousingPartners LLC AHP, Inc., Noel Khalil, Jim Grualey, Joe Dingle, Gary Lashaw, Magistrate Court of Dekalb County, Georgia, Mario Breedlove, Tiffany Carter-Sellers, Aytunde Ezekiel

INC ity

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

PRO SE

PRO SE     price

| **PARTY** (Check One Box Only) | **PARTY** (Check One Box Only) |
|---|---|
| ☑Debtor   ☐ U.S. Trustee/Bankruptcy Admin | ☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin |
| ☐ Creditor   ☐ Other | ☑Creditor   ☐ Other |
| ☐ Trustee | ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

FRAUD, WILLFUL VIOLATION of STAY, SALE of PARTNERSHIP Breech of CONTRACT

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☑ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☑ Check if this case involves a substantive issue of state law   ☐ Check if this is asserted to be a class action under FRCP 23
☐ Check if a jury trial is demanded in complaint   Demand $ 5,000,000

Other Relief Sought

get Personal belonging From Residents   WAIVER Jury Trial   immediate Help

2014 NOV -5 PM 3:33
BY ___ DEPUTY CLERK
REGINA THOMAS
FILED IN CLERK'S OFFICE
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR *Cheree Newsm-Pace* | BANKRUPTCY CASE NO. *14 BK 65511* | |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE *Murphy* |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) *PRO SE Cheree Newsm Pace* | | |
| DATE *NOV 5, 2014* | PRINT NAME OF ATTORNEY (OR PLAINTIFF) *Cheree Newsm Pace* | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

1

2

IN UNITED STATES FEDERAL
NORTHERN DISTRICT OF GEORGIA

3

ADVERSARY complaint

4 | Re: CHEREE PACE                          )   Case
        Debtor                               )   No.: 14- 65311
5 |                                          )   Adversary Complaint.:
                                             )
6 | vs                                       )
                                             )
7 |                                          )
    NEW COLUMBIA RESIDENTIAL, COLUMBIA )
8 | RESIDENTAIL PROPERTY MANGMERS,          )   Waver of Jury Trial enclosed
    COLUMBIA-MRA PARK CITY PLACE, LLC,
9 | NEW AFFORDABLE HOUSINGPARTNERS
    LLC AHP, INC.
10 | NOEL KHALIL,JIM GRUALEY, JOE DINGLE
    1718 Peachtree Street SW Suite 684
11 | Atlanta, GA  30309

12

13 | JOE DINGLE
    140 Milano Dr., SW
    Atlanta, GA  30331

14

15 | GARY LASHAW
    Commerce Plaza, Suite 800
    755 Commerce Drive
16 | Decatur, Georgia 30030

17

    Magistrate Court of DeKalb County, Georgia
18 | 556 N. McDonough Street, Suite 270,
    DeKalb County Courthouse,
19 | Decatur, GA 30030

20 | MARIO BREEDLOVE
    3781Presidential Parkway
21 | Ste.111-A
    Atlanta, GA 30340

22

23 | TIFFANY CARTER-SELLERS
    Georgia Bar No 15850
24 | 230 Peachtree Street, NW
    Suite 1460
25 | Atlanta, GA  30303

26 | AYTUNDE EZEKEIL
    233 Mitchell Street
27 | Suite 410

28

FILED IN CLERK'S OFFICE
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT
OF GEORGIA

2014 NOV -5  PM 3: 33

M. REGINA THOMAS
CLERK
BY_____
DEPUTY CLERK

ADVERSARY COMPLAINT
P a g e | 1

1

Atlanta, GA 30303
        Defendants

2

3

4

5

6

7

8

9

10

11

————————————————————

12

13  ## ADVERSARY COMPLAINT TO,(A) VIOLATION OF THE
14  ## AUTOMATIC STAY (B) FRUAD (C) BREECH OF CONTRACTS
    ## (D) SALE OF 25% INTEREST

15

16

17

18  Defendant, CHEREE NEWSON-PACE, in the above action, pro se, suggests to this Court that

19  she filed a petition in Bankruptcy under Chapter 13 of the United States Bankruptcy Code in the

20  District Court of the United States for the Northern District of Georgia. The petition was filed

21  with the Court on or about 05/02/2014 and subsequently a Chapter 7  was filed on 08/08/2014,

22  and the Defendant was adjudicated bankrupt on 05/02/2014. The Court assigned Case No. 14-

23  65511 **and** 1-64789 as the docket number to the petition.  A bundle of torts including fraud,

24  negligent misrepresentation, interference with contractual relations, interference with prospective

25  advantage, and injurious falsehood has dismantled an organization and HUD Funding intended

26

27  to assist in preventing homelessness has been used to monopolize an area in DeKalb County.

28  **ADVERSARY COMPLAINT**
    **P a g e | 2**

## II. JURISDICTION AND VENUE

A.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

This is the proper forum in which to maintain this proceeding pursuant to 28 U.S.C.  § 1409

The district court has "exclusive jurisdiction of all of the property, wherever located, of the

debtor as of the commencement of [the] case." 28 U.S.C. § 1334(d). A bankruptcy court is a

"unit of the district court." 28 U.S.C. § 151. Section 362 implements this jurisdiction and is

supplemented by § 105(a), which authorizes a court to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of the Code.

B.   The broad jurisdictional base of Section 362 confirms the court's inherent power to protect

property within its jurisdiction and to prevent any divestiture of that jurisdiction. Isaacs v. Hobbs

Tie & Timber Co., 51 S. Ct. 270, 282 (1931) (held, jurisdiction of bankruptcy court respecting

property of debtor's estate having attached, actions brought in other courts could not affect it).

See In re Mohawk Greenfield Motel Corp., 239 B.R. 15 (Bankr. D. Mass. 1999) ("the automatic

stay protects the bankruptcy court's exclusive jurisdiction over the debtor and its property")

(citing In re Soares, 107 F.3d 969, 975 (1st Cir. Mass. 1997)).

C. The legal predicates for the relief sought herein are based upon Section 544 of the United

States Bankruptcy Code (the "Bankruptcy Code").  Economic tort of intentional infliction of

emotional distress has four elements: (1) the defendant must act intentionally or recklessly; (2)

the defendant's conduct must be extreme and outrageous; and (3) the conduct must be the cause

(4) of severe emotional distress.

B.

**ADVERSARY COMPLAINT**
**P a g e | 3**

## JOINDER RULE

Rule 20. Permissive Joinder of Parties

(a) PERSONS WHO MAY JOIN OR BE JOINED.

(1) *Plaintiffs.* Persons may join in one action as plaintiffs if:

(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all plaintiffs will arise in the action.

(2) *Defendants.* Persons—as well as a vessel, cargo, or other property subject to admiralty process in rem—may be joined in one action as defendants if:

(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all defendants will arise in the action.

(3) *Extent of Relief.* Neither a plaintiff nor a defendant need be interested in obtaining or defending against all the relief demanded. The court may grant judgment to one or more plaintiffs according to their rights, and against one or more defendants according to their liabilities.

(b) PROTECTIVE MEASURES. The court may issue orders—including an order for separate trials—to protect a party against embarrassment, delay, expense, or other prejudice that arises from including a person against whom the party asserts no claim and who asserts no claim against the party.

## Motion to Joinder

Debtor motion to have Defendants join based on Rule 20 as stated above.

**ADVERSARY COMPLAINT**
P a g e | 4

## C. **PARTIES**

A. The Debtor **CHEREE PACE** was in Chapter 13 was filed on May 2014, which was dismissed on      and then   applied under Chapter 7 on August 8, 2014.  (the "Debtor") for the bankruptcy estate of the CHEREE PACE.   She remains a Partner and member of the Management team owning 25% as a Developer and 25% as an owner of Columbia-MRA Park City Place LLC.

B. **MOTHERS REBUILDING ATLANTA, INC** pursuant to 11U.S.C.A. § 362 and *Queenie, Ltd v. Nygard Intern.,* 321 F.3d 282(2d Cir. 2003) (automatic stay extends to the debtor's wholly-owned corporations) as 100% ownership of Mothers Rebuilding Atlanta, Inc.


C. Defendant Attorney **Mario Breedlove**, Committed perjury in order to "Steer" the case and assist the Defendants providing injurious falsehoods in Dispossessory Court of DeKalb County. On March 27·2014, attorney **Mario Breedlove** told the Magistrate Judge Gary Lashaw of DeKalb County that Cheree Pace was a squatter and that his Clients (Columbia MRA-Park City Place ( MRA for Mothers Rebuilding Atlanta, Inc.) Perjury 18 U.S. Code § 1621  was used in multifarious means ingenuity devised by the Plaintiffs attorney to get an advantage over me, using false suggestions and suppression of the truth committing 1st case of  Fraud as suggested by the 18th U.S. Code § 1001 (a)(1)(2). This action caused the court in DeKalb County to refuse to look at any of the legal documentation I had available, that would have validated the core issues.

**ADVERSARY COMPLAINT**
P a g e | 5

D.   Defendant **Judge Gary Lashaw** sided with Breedlove Not being allowed "Due Process" (Bill of Rights 5th amendment) as a result of the sworn testimony of the Attorney and Columbia Residential staff, the Court refused to view the legal documents or allow me to cross examine anyone.  In Fairness to be heard at a meaningful time in a meaningful way, the court would have decided through the supported substantial evidence, that the problem existing between Columbia Noel, Cheree Pace and Mothers Rebuilding Atlanta, Inc. was a matter of Real Estate which would warrant a dismissal or set the case aside.  The Debtors Constitutional rights by not allowing a response to the false allegations of Mario Breedlove and Joe Dingle. Judge Lashaw to Cheree Pace to Shut up and sit down (Pace was standing initially as a defendant in dispossessory court). Lashaw stated aloud speaking to Breedlove that he would change the Debtor for 6 months back rent for each house, just in case she decides to appeal.  For this reason Cheree Pace filed bankruptcy to avoid the over 45,000 debt that was added to her judicial record and has assisting in homelessness. Leshaw continues to willfully violate Automatic stay.

*The stay has not been modified by the court, and remains in effect for the duration of a bankruptcy case, and generally cannot be waived by the creditor or the debtors. Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194 (3d Cir. 1991) (held, because automatic stay serves interests of both debtors and creditors, it may not be waived and its scope may not be limited by debtor).*

E.   Defendant Joe Dingle testified on the Debtor committing PURJURY Perjury 18 U.S. Code § 1621 as a multifarious means, ingenuity devised by the Defendants to get an unfair advantage over the Debtor **(Exhibit B)** Joe Dingle as Lead Project manager .

**Joe Dingle** was the lead Project Manager for Columbia Residential, under oath

**ADVERSARY COMPLAINT**
**P a g e | 6**

agreed to the statement that the Debtor Cheree Pace was a squatter and that the

Defendant did not know Cheree Pace.  Form 100 (**Exhibit C**) of the Federal HOME

loan application defines the role of a non-profit organization for the purpose of

Affordable Housing and HUD also has regulations as to partnerships for this purpose.

F.  Defendant **Noel Khalil** led the way paying for Columbia filing a dispossessory

assisted them in gaining and unfair advantage.  The real issue is money and property.

Dispossessory court was not the jurisdiction for Real Estate matters, but it would

allow them to get rid of us quickly.  The courts don't communicate to each other and

MRA did not anticipate the Defendants disregards for Federal Laws. Noel is the

mastermind of Aka Columbia Residential LLC, New Columbia Residential LLC,

Columbia Residential Management LLC and Affordable Housing Partners, LLC.

AHP.Inc, New Columbia Residential, New Affordable Partners.

G.  Defendant Jim Grauley is the registered agent of Columbia-MRA Park City place

LLC. , the partner in the 1st of Mothers Rebuilding Atlanta's development projects.

G. Defendant Aytunde' Ezekiel  failed to represent Debtor or advise her of th Automatic
Stay provisions.

H. Defendant Tiffany Sellers willfully violated the Automatic stay provisions

**ADVERSARY COMPLAINT**
**P a g e | 7**

## COUNT ONE

## VIOLATIONS OF THE AUTOMATIC STAY

1.      Violation of the Automatic Stay, under case number 14-65511

2.      Plaintiff filed his Chapter 13 on May 2, 2014 and a 7 bankruptcy case on August 8, 2014.

3.      The foregoing paragraphs are incorporated herein by reference.

4.      Defendants conduct violated 11 U.S.C. 362(a)       .

5.      Defendants New Columbia Residential, Affordable housing Partners by way of Attorney Tiffany Sellers filed on  August 22, 2014 a motion for Sanctions, and Motion for Summary Judgment.

6.      Defendant knew of the bankruptcy case no later though

7.      May 7, 2014  Judge Gary LaShaw signed a motion to stay as per Automatic Stay.  On May 9, 2014 Cheree Pace move back into her residence to avoid homelessness.

8.      On     Cheree Pace was arrested and jailed despite proof of the Automatic Stay and her residence was boarded.

9.      On May 15, 2014,although there was no there is no evidence Mario Breedlove and the DeKalb County Marshal's office evicted Cheree Pace while the stay was in place.

9.      On     August 15, 2012, Plaintiff's received a was evicted from the residence for the second time

10.     Plaintiff has suffered actual damages as a result of the aforementioned activities. Plaintiff's damages include emotional distress, out-of-pocket expenses.

11.     Once a creditor receives notice of a Chapter 7 bankruptcy filing, creditor has an affirmative duty to undo its violations of automatic stay. (In re Keen, 301 B.R. 749 Bkrtcy. S.D. Fla. 2003).

### ADVERSARY COMPLAINT
### P a g e | 8

## *WILLFUL VIOLATION OF STAY*

*The filing of a bankruptcy petition invokes the automatic stay provisions of 11 U.S.C. § 362(a) once in effect, pre-petition creditors are prohibited from taking certain actions to collect their debts. See, 11 U.S.C. § 362; In re Vitreous Steel Products Co., 911 F.2d 1223, 1231 (7th Cir.1990). The automatic stay is self-executing, effective upon filing of the bankruptcy petition. In re Gruntz, 202 F.3d 1074, 1081 (9th Cir.2000). The automatic stay is a powerful tool of the bankruptcy courts that prohibits, among other things, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title" [11 U.S.C. § 362(a)(1) ]; "the enforcement, against the debtor ... of a judgment obtained before the commencement of the case under this title" [11 U.S.C. § 362(a)(2) ]; and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case" [11 U.S.C. § 362(a)(6) ]. See, In re Lyckberg, 310 B.R. 881, 890 (Bankr.N.D.Ill.2004). The automatic stay is one of the fundamental debtor remedies under the Bankruptcy Code. Congress fully intended that its scope be broad. H.R.REP. No. 595, 95th Cong. 1st Sess. 340 (1977), U.S. Code Cong. & Admin. News, pp. 5787, 6296, 6297; Small Business Admin. v. Rinehart, 887 F.2d 165, 168 (8th Cir.1989) The stay is imposed automatically in part to give the bankruptcy court an opportunity to assess the debtor's situation and to embark on an orderly course resolving the estate. United States v. Michalek, 54 F.3d 325, 333 (7th Cir.1995). As stated in, In the Matter of Holtkamp and Holtkamp Farms, Inc., 669 F.2d 505, 508 (7th Cir.1982):*

*The purpose [of the automatic stay] is to preserve what remains of the debtor's insolvent estate and to provide a systematic equitable liquidation procedure for all creditors, secured as well as unsecured, H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), reprinted in (1978) U.S.Code Cong. & Ad. News 6296-97, thereby preventing a "chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." In re Frigitemp Corp., 8 B.R. 284, 289 (S.D.N.Y.1981) citing Fidelity Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 55 (2d Cir.1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977).*

*In re Galmore, 390 B.R. 901 (Bankr. N.D. Ind. 2008)*

*2.  11 U.S.C. §362(a)(3) operates as an automatic stay of "any act to obtain possession of property of the estate or property from the estate."[1] The stay, "one of the fundamental debtor protections provided by the bankruptcy laws," H.R.Rep. No. 595; 95th Cong 1st Sess 340 (1977), reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 6296, does not require actual notice to be effective. The filing of the petition operates as notice to the world.2 Mueller v. Nugent, 184 U.S. 1, 14, 22 S.Ct. 269, 274, 46 L.Ed. 405 (1902); Bank of Marin v. England, 352 U.S. 186, 192 (9th Cir. 1965).*

---

[1] Judgment creditor who, despite having notice of debtor's Chapter 7 filing, took no steps to obtain recall of bench warrant previously issued for debtor's arrest based on her failure to appear either at proceeding to discover assets or at subsequent civil contempt hearing, and who, at first meeting of creditors, appeared with copy of bench warrant and made sure that it was seen by officers who then took debtor into custody, "willfully" violated automatic stay, so as to be liable for any resulting damages. In re Galmore, Bkrtcy.N.D.Ind.2008, 390 B.R. 901.

**ADVERSARY COMPLAINT**

**P a g e | 9**

*Matter of Carter, 16 B.R. 481, 482-83 (W.D. Mo. 1981) aff'd, 691 F.2d 390 (8th Cir. 1982)*

3. *Ultimately, the breadth of § 362(a)(1) drives the conclusion to this issue, as to the automatic stay. Under this provision's language, a debtor in bankruptcy is protected from the "commencement or continuation" of any "judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [debtor's bankruptcy] case." See In re Panayotoff, 140 B.R. 509, 511 (Bankr.D.Minn.1992). Section 362(a)(1) clearly encompasses all claims, causes of action, or rights to any form of civil legal relief that are founded on factual bases that arose pre-petition. "Every proceeding of a judicial or quasi-judicial nature is affected." In re Joe DeLisi Fruit Co., 11 B.R. 694, 695 (Bankr.D.Minn.1981). This has to include proceedings for adjudications of civil contempt, where the act in question is the debtor's alleged pre-petition violation of a court order. The automatic stay, then, restrains all persons and entities from initiating civil contempt proceedings against a debtor in bankruptcy. It continues to do so until the bankruptcy court grants relief from the stay, or until the stay terminates by operation of 11 U.S.C. § 362(c). In re Atkins, 176 B.R. 998, 1005-06 (Bankr. D. Minn. 1994)*

13. *The filing of a petition bankruptcy effectuates automatic of all proceedings against debtor effective the date the petition is filed and actions taken in violation of stay are void, even if there is no actual notice of the stay. (Personalized Air Conditioning, Inc.v. C.M. Systems of Pinellas, 522 So.2d. 465 Fla.App. 4 Dist, 1988).*

14. *Once a creditor receives notice of a Chapter 7 bankruptcy filing, creditor has an affirmative duty to undo its violations of automatic stay. (In re Keen, 301 B.R. 749 Bkrtcy. S.D. Fla. 2003).*

15. *There can be no doubt that the Defendant had knowledge of the Plaintiffs pending bankruptcy case.*

16. *Defendant is listed as a creditor in Plaintiffs bankruptcy petition under Schedule F.*

WHEREFORE, Debtor requests an order finding the Defendant to be in civil contempt by violating the automatic stay, and awarding Debtor actual damages, including costs and punitive damages pursuant to 11 U.S.C. 362(k) and for contempt of court.

## COUNT TWO

## FRAUD

1. As the Managing partner of Columbia-MRA Park City Place LLC.,    has the opportunity to circumvent, direct staff and his attorney as to the true facts of this case.

2. Columbia / Noel has managed the direct underlining of the perjury that went on in court.

**ADVERSARY COMPLAINT**
**P a g e | 10**

3.   The attorney's (although customary) has asked for information that the plaintiff know would be a hardship, considering how my office was dismantled, equipment stolen, and my personal belongs has been in the property that was boarded up while things where being moved out.

4.   The request for this information was mint to discourage, frustrate and confuse the facts, just as the perjury committed in Dispossessory Court, which has caused a snow ball reaction.

5.   Noel Khalil has been involved in many cases that involve Fraud, and it's not at all his first time being accused of fraud (*See Case law Khalil v. Jones et al* ), or closely related to fraudulent acts.

6.   Noel Khalil/ Columbia Residential would instruct their Attorney to falsify information that can all be proven with court documentation, Federal Laws, along with HUD and County Guidelines.

7.   The confusing of the courts mixed with the lies has delayed any restitution that Cheree Pace or Mothers Rebuilding Atlanta, Inc. could receive, and has served a challenge to any attorney providing too much work without a large fee.

8. Mothers Rebuilding Atlanta, Inc. reliance on relied on Noel Khalil as a seasoned professional and a mentor to abide by Federal Laws along with State and County regulations as set out by HUD Construction Loan Documents and guide MRA through the process.

9. Additionally, Mothers Rebuilding Atlanta, Inc and Cheree Pace was reliant of this initial investment to match funding opportunities to provide a budget for the upcoming 2014 Budget, that would have provided salaries and job opportunities, that intern would assist with self-sufficiency.

10. The partnership as a Developer was only to benefit for the purpose of earning Developers Credits would need have assisted Mothers Rebuilding Atlanta to pursue other affordable housing

**ADVERSARY COMPLAINT**
**P a g e | 11**

projects to provide On the Job Training as well as assisted the organization in becoming self-sufficient.

    b.      The Georgia Secretary of State has no recognitions of Mothers Rebuilding Atlanta, Inc. or Cheree Pace, thus would not support the purpose of the collaboration, in the first place.

    c.      The Tax ID number used in the H.O.M.E application should reflex 58-2410639 (**Exhibit F copy of Mothers Rebuilding Atlanta's Tax ID issued by Georgia Secretary of State.**) which is Mothers Rebuilding Atlanta, Inc proper Tax Identification number. (**Exhibit G Home application**)

*A false representation of a matter of fact—*
*whether by words or by conduct, by false or misleading allegations, or by concealment of what sh ould have been disclosed—*
*that deceives and is intended to deceive another so that theindividual will act upon it to her or his legal injury.Fraud is commonly understood as dishonesty calculated for advantage.*
*Fraud must be proved by showing that the defendant's actions involved five separate elements: (1) a false statement of a material fact,(2) knowledge on the part of the defendant that the statement i s untrue, (3) intent on the part of thedefendant to deceive the alleged victim, (4) justifiable relianc e by the alleged victim on the statement, and (5) injury to the alleged victim as a result. Fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another.")*

*In Georgia there are five elements of the tort of fraud. These are a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by the plaintiff, and damage to the plaintiff. Grizzle v. Guarantee Ins. Co., 602 F. Supp. 465, 467 (N.D. Ga.1984).*

- WHEREFORE, Debtor requests an order finding the Defendant to be **Prison.** Someone convicted of a federal fraud crime faces serving time in a federal prison. **Fines.** The fine for any conviction of a federal fraud law can be extremely high. Fraud with a wide ranging impact and high dollar value, such as fraud committed by companies or

**ADVERSARY COMPLAINT**
P a g e | 12

organizations, can result in fines of tens of millions of dollars or more. **Restitution.**
Restitution is paid by perpetrators of fraud to the victims in order to compensate them for
their losses. **Probation.**

### COUNT THREE

**BREACH OF CONTRACT**

**A-2 Construction Loan Agreement (Exhibit F)**

**Page 9 Article 4.06** Conflicting Transaction of Borrower  That the consummation of the
transactions hereby contemplate and the performance of the obligations of Borrower under and
by virtue of the Loan Documents (a) will not conflict with or result in any breach of, or
constitute any default under, any mortgage, security deed, deed of trust, lease, bank loan, or
credit agreement or other agreement or instrument to which Borrower is a party or by which it is
bound or affected, (b) will not conflict with or violate any laws or regulations or judgment, order
or decree of any Governmental Authority, and (c) will not require the Consent of any
Governmental Authority or any other third party, except those Consents which have been duly
obtained, made or complied the date thereof and which are in full force and effect.

**Page 15 5.19** <u>Disclosure of Material Matters.</u> To (a) promptly notify Lender in writing of any
claim, litigation, suit or administrative proceeding affecting Borrower, whether or not the claim
is covered by insurance, and of any litigation, suit or administrative proceeding, which in any
such case affects Borrower's properties or which could reasonably be expected to have a
Material Adverse Effect and (b) promptly notify Lender in writing upon the occurrence of **(i)** any
Event of Default or other default under the Loan Documents; (ii) any event of default or default
under the Senior Bank Loan Documents; (iii) any event which with the giving of notice or lapse

**ADVERSARY COMPLAINT**
**P a g e | 13**

of time, or both, would constitute an event of default or default under the Senior Bank Loan Documents (iv) any event, development or circumstance whereby any financial statements or other reports furnished to Lender fail **in** any material respect to present fairly, **in** accordance with GAAP consistently applied, the financial condition or operating results of Borrower as of the date of such statements;

**Page 16 5.22** Federal regulations **a, b,** (Remember this is just as it relates to the 1.2 m not the entire project) Executive orders 11625, 12432 and 12137, as amended, which require Borrower to establish a minority outreach program to insure the inclusion to the maximum extent possible, of minorities and women and entities owned by minorities women in the carrying out of any activities pursuant to this Agreement and in the operation and management of the Project,. Borrows shall maintain records, documentations and data as required by the HOME Regulations or by Lender.

**Page 21 7.02** Default Under Loan Document. Any other default or event of default occurs under any of the Loan Documents; or

**Page 21 7.03** Breach of Covenant. Borrower breaches or fails to perform, observe or meet any covenant or condition made in any Loan Document and does not cure same (i) with respect to such breaches or failures curable solely by the payment of money, within ten (10) days after delivery of written notice thereof; or (ii) with respect to all other such breaches and failures, within thirty (30) days after delivery of written notice thereof; *provided,* with respect to breaches or failures that cannot be cured by the payment of money and cannot be reasonably cured within thirty (30) days after delivery of written notice thereof, but can be cured, no Event of Default shall exist hereunder (x) so long as Borrower promptly commences and thereafter diligently

pursues the cure of such breach or failure, (y) so long as Borrower continues to satisfy all of

Borrower's monetary obligations, covenants and conditions under the Loan Documents, and (z)

so long as, in Lender's reasonable judgment, the Project can be completed by the Completion

Date within budget;

**Page 21 7.04** Noncompliance with Federal Requirements

**Page 21 7.07** Litigation Against Borrower. Any suit shall be filed against Borrower, which if

adversely determined could reasonably be expected to substantially impair the ability of

Borrower to perform each and every one of its respective obligations under and by virtue of the

**Page 26 9.14** WAIVER OF JURY TRIAL WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER ORUNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.14 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOAN MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Page 27 9.17 <u>Legal Construction</u> ) Legal Construction. Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that the agents of all parties have participated in the preparation hereof

Page 15 5.20    Lease of U<u>ni</u>ts. To place all buildings of the Project into Service and make every HOME Assisted Unit available for lease prior to June 27,2016

Page 16 5.22    <u>Federal Requirements.</u> Borrower shall comply with all Federal laws applicable to the Project including, but not limited to, the following federal laws:

Section 3 of the Housing and Urban Development Act of !968, and implementing regulations, as amended, which requires that, to the greatest extent feasible, (i) oppm1unities for training and employment arising in connection with the planning and carrying out of the Project will be provided to Low and Very Low Income persons residing within the area of the Project; and (ii) contracts for work  will  be awarded to business concerns which are located in or owned by persons residing within the area of the Project.

**HOME Funds Application (Exhibit H)**

**Non-Profit Determination**

To qualify for non-profit preference, a non-profit must materially participate in the development and operation of the project throughout the compliance period. Within the meaning of IRS 469(h), "a(non-profit) shall be treated as materially participating in an activity only if the

(nonprofit) is involved in the operations of the activity on a basis that is regular, continuous, and substantial."

WHEREFORE, the Plaintiff seeks the relief as set forth at the conclusion of this Adversary Proceeding Complaint

## COUNT FOUR

**SALE OF 25% INTEREST**

It is of the best interest of Mothers Rebuilding Atlanta, Inc and Cheree Newson-Pace Article9.2 of the Operating agreement of Columbia MRA-Park City Place LLC (**Exhibit _A_** ). To sale the 25% of both the Developers Interest and that of the Owner as 25%.   This is calculated via approximate conservative appraisal amount (1,000,000), plus the after construction cost (cost of construction is 11,000,000 approx.) Developers Interest is 15% of the total amount of construction which includes the appraised value which is 12,000,000, 15% of 12,000,000= 1,800,000 of which 25%= 450,000 is owed to Cheree Pace MRA. ((Exhibit _C_ )the HOME application as to limits of Developers Fees) in the amount of 450,000-25,000 (previously given to MRA by Affordable Housing Partners(**Exhibits _B_** ) **425,000.00 owed on Developers Fee's only. ((Exhibits     )HOME application actuals turned into the Federal Government)  25% of the project Rents for 30years. ((Exhibits _B_ ) Document Fraud See construction Loan document which shows a 1% loan on 1,200,000 initial Dekalb County HOME loan. Document shows 1ˢᵗ position loan as costing over 323,685.24 per a year, and a fee of operating expenses of   345,600.00. The operating expenses on the document to Dekalb County is showing 50,000   for operating expenses (the file I was sent says Cheree copy my assumption is that I can't read or add and that I don't know the contracts I signed or gave**

**ADVERSARY COMPLAINT**
**P a g e | 17**

**over the rights to sign). Which shows that the Income projections don't add up. FRUAD!** Instead of the after Tax income projection being 27,000 going up 10% each year its showing in the document that the Federal Government is getting (possibly the accountant). The actual amount is 700,000 plus after tax income of which MRA/ Cheree Newson Pace would get 25%. A much bigger amount that would allow us to run our operation and pay salaries.

This is a core proceeding under 11 U.S.C. §363(h)(i)G), 11 U.S.C. §541 (a), 11 U.S.C. §726 (c) and FRBP 7001 (3) to obtain Court approval for the sale of both the interest of the estate and of co-owners of the property described below, with the distribution of the proceeds of the sale to be effectuated according to the percentage of ownership of each Co-defendant and the Debtor. This Honorable Court has jurisdiction over this case pursuant to 28 U.S.C. §157 (b)(2)(N) and 28 U.S.C. 1334.

**MOTHERS REBUILDING ATLANTA, INC** pursuant to 11U.S.C.A. § 362 and *Queenie, Ltd v. Nygard Intern.,* 321 F.3d 282(2d Cir. 2003) (automatic stay extends to the debtor's wholly-owned corporations) Cheree Pace is 100% owner of Mothers Rebuilding Atlanta, Inc. Consideration that the Defendant did not use the proper Tax ID the Property would be property of Cheree Newson- Pace.

WHEREFORE, the Plaintiff seeks the relief **(Exhibit I) Acknowledge Cheree Newson-Pace as 100% owner because that is not Mothers Rebuilding Atlanta, Inc. Tax ID.**

**ADVERSARY COMPLAINT**
**P a g e | 18**

## COUNT FIVE

**Emotional Distress**

Plaintiff's emotional distress damages include, but are not limited to, the fear that his financial situation may cause them to lose their house. These worries and concerns were separate from the anxiety felt about filing for bankruptcy, as a result of being falsely jailed, homeless, (tool stolen) challenges with work as a contractor without tools. The circumstances surrounding the violations make it obvious that a reasonable person would suffer significant emotional harm.

*Debtors may recover damages for emotional distress for violation of automatic stay, even in absence of economic injuries. Dawson v. Washington Mut. Bank (In re Dawson), 390 F.3d 1139, 1149 (9th Cir. 2004) (held, debtor may recover emotional distress damages, even in absence of economic injury, if individual shows it: (i) suffered significant harm; (ii) clearly establish significant harm; and (iii) causal connection between significant harm and violation of automatic stay). Accord In re Stinson, 128 Fed. Appx. 30, 31 (9th Cir. 2005); Fleet Mortg. Group, Inc. v. Kaneb, 196 F.3d 265, 269 (1st Cir. 1999); In re L'Heureux, 322 B.R. 407, 411 (B.A.P. 8th Cir. 2005). Compare Aiello v. Providian Fin. Corp., 239 F.3d 876 (7th Cir. 2001) (debtor may recover emotional distress damages if it can show it suffered financial loss). But see U.S. v. Harcher, 331 B.R. 720 (N.D. Ohio 2005) ("§ 362(h) does not provide for recovery of damages related to emotional distress").*
*Debtor may commence action to recover damages for willful stay violation in district court. See Justice Cometh Ltd. v. Lambert, 426 F.3d 1342 (11th Cir. 2005) (held, district court had original, non-appellate jurisdiction under 28 U.S.C. § 1334 over proceeding to recover damages for alleged willful stay violation). But see Eastern Equipment & Serv. Corp. v. Factory Point Nat'l Bank, 236 F.3d 117 (2d Cir. 2001) (held, § 362(h) claim must be brought in bankruptcy court, not district court, which only has appellate jurisdiction over bankruptcy cases.*

WHEREFORE, the Plaintiff seeks the relief as set forth at the conclusion of this Adversary Proceeding Complaint. Debtors may recover damages for emotional distress for violation of automatic stay, even in absence of economic injuries.

**ADVERSARY COMPLAINT**
**P a g e | 19**

## COUNT SIX

**WHEREFORE**, the Plaintiff respectfully requests this Court make such findings and enter such judgments as are appropriate, including, without limitation, alternatively or cumulatively, the following:

A.   A determination that the Defendants do not have a perfected security interest in the Real Property.

B.   A determination that the claims of the Defendants as a result of and/or arising from the Real Property are unsecured claims.

C.   Judgment in favor of the Plaintiff and against the Defendants.

E.   An order that the Defendants immediately release give access to the property located in the units.

F.   Judgment in favor of the Plaintiff and against the Defendants in the amount of the damages incurred by the Plaintiff, including the market value of the property, costs and attorneys' fees

G.   The grant of such other and further relief as is just and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, it is requested from this Honorable Court for relief as follows:

A)   Issue judgment allowing the Trustee to sell the properties of the Estate free and clear of co-ownership interest, subject to 11 U.S.C. §363 (h) (i) G),

**ADVERSARY COMPLAINT**
**P a g e | 20**

B) Issue judgment allowing the Trustee to receive and distribute to creditors of the bankruptcy estate the proceeds of the sale of this properties pursuant to the provisions of 11 U.S.C. §541 (a) and 11 U.S.C. §726 (c) in compliance with *In Re Bobonis,* supra.

1. Deliver to the Defendant balance and the surplus that may result after payment of debts of the Debtor and the Defendant and the administrative expenses of the Estate. Columbia-RA Park City Place provide all documents and updates to the court, so as to determine the amount of the 15% of the developers' fee due to MRA and/ or Cheree Pace.

2. Columbia MRA-Park City Place submit the proper document for before and after Tax Income projection to match the application (surely and oversight from DeKalb) to reflect the proper 25% owed as a partner.

3. Force the sale of the 25% ownership of NCR for the Estimated after Build Value of the property (to be determined by an appraiser), *plus* the remaining Developers Fee (as determined by documentation requested on number 4 above), *plus ACCTUAL* Income projections/ Profits (for the 15 years based, *Minus* the real numbers with loan payback with low income rates and operating expenses of 59,000 located in our HOME application submitted to the Federal Government (**Exhibits G**). (Not the inflated representation of this document that was given to show more liability and less profit, which would greatly reduce the amount owed to MRA and Substantially effect TAX Liability) , Interest accumulation (that would have been Earned by CMCPC, had not acted so recklessly) (**Exhibit K) to show value of over 4,500,000 owed to Mothers Rebuilding Atlanta, Inc Cheree Newson-Pace**

4. The Reasonable salary that Cheree Pace would earn as a Managing member as stated in the Operating Agreement (**Exhibit L**)

**ADVERSARY COMPLAINT**
**P a g e | 21**

5. Since the wrong tax-ID was used and there is NO trace what so ever of the partnership on the Secretary of State except the operation agreement that this case move forward as Cheree Pace only (~~Exhibit M~~)

6. Actual damages for Mothers Rebuilding Atlanta for the loss of uniforms, materials and tool **(Exhibit N) (Since there staff disposed of and stole as the Marshall's executed their Writ.**

7. The $40,000 be returned to Cheree Pace Estate to offset the reason for filing Chapter 13, and 7.

8. The Honorable Judge execute any and all actions without a Jury trial. As set in our signed agreement, WAIVING our RIGHTS to a JURY TRAIL, as stated in our agreement ARTICLE **26 9.14** that cannot be amended under any circumstances **(Exhibit ~~N)~~** of the Construction Loan Document. **(Exhibit O) Margaret Jones case 11 year madness.**

*A Adversary Complaint*

9. Restore my place as an opportunity to regain my place in society purchase Materials, tools stolen and addict housing.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court exam the facts and uphold the law.

Respectfully submitted, this **5th** day of **Nov**, 2014.

*Cheree Pace*

CHEREE PACE, Pro Se

P.O BOX 19202

ATLANTA, GA 31126

**ADVERSARY COMPLAINT**
**P a g e | 22**

# OPERATING AGREEMENT
# OF
# COLUMBIA-MRA PARK CITY PLACE, LLC

### A Georgia Limited Liability Company

**THIS OPERATING AGREEMENT** is made and entered into as of the 6th day of June, 2013, by the Members of **COLUMBIA-MRA PARK CITY PLACE, LLC**, a Georgia limited liability company.

## W I T N E S S E T H:

**WHEREAS,** the undersigned have agreed to organize a limited liability company under the Georgia Limited Liability Company Act in accordance with the terms and conditions set forth in this Agreement;

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned Members hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

*"Adjusted Capital Account Deficit"* means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) the deficit shall be decreased by amounts which the Member is obligated to restore pursuant to this Agreement (if any) or is deemed obligated to restore pursuant to the Code or the Regulations; and (ii) the deficit shall be increased by the items described in Regulation §§ 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

*"Affiliate"* means any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with a Person. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote ten percent (10%) or more of the securities having ordinary voting power for the election of directors of such Person, or (ii) to direct, or cause the direction of, the management and policies of such Person, whether by contract or otherwise. In the case of an individual, an Affiliate shall include any relative or family member of such Person. In the case of an entity, an Affiliate shall include any officer, director, trustee, partner, manager, or member of such entity.

*"Agreement"* means this Operating Agreement, as amended from time to time.

*"Capital Account"* means the account to be maintained by the Company for each Member in accordance with the provisions of Regulation § 1.704-1(b), and all provisions of this

Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"*Capital Contribution*" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation § 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"*Company*" means the limited liability company operated in accordance with this Agreement.

"*Economic Interest*" means a Member's share of Profits and Losses, distributions, and allocations of Company items.

"*Georgia Act*" means the Georgia Limited Liability Company Act, O.C.G.A. § 14-11-100 *et seq.*, as amended from time to time.

"*Involuntary Withdrawal*" means (i) if such Member is an individual, upon the Member's death or incompetency; (ii) if such Member is an entity, upon its dissolution and winding up, liquidation, or other termination; (iii) if such Member is an estate or trust, the distribution by the fiduciary of the Member's entire Membership or Economic Interest in the Company; and (iv) with respect to any Member, upon the occurrence of a bankruptcy event as set forth in O.C.G.A. §§ 14-11-601(a)(5) through (7).

"*Managing Member*" means the Member who shall be responsible for the overall management and operation of the Company in accordance with the terms of this Agreement.

"*Member*" means each Person signing this Agreement and any Person who subsequently is admitted as a Member of the Company.

"*Membership Interest*" means the ownership interest of a Member in the Company, including the Member's Economic Interest and the Member's rights and obligations with respect to the Company as set forth in this Agreement. For purposes of this Agreement, each Member's Membership Interest shall be expressed as a percentage and set forth in Exhibit A, attached hereto and made a part hereof.

"*Net Cash Flow*" means all cash funds derived from operations of the Company, less cash funds used to pay current operating expenses, including any compensation paid to the Managing Member, or to establish reasonable reserves as determined by the Managing Member and approved by Members representing a majority of the Membership Interests of the Company.

"*Person*" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"*Profit*" and "*Loss*" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in

965269-1                                            2

accordance with Code § 703(a), adjusted as follows: (i) all items of income, gain, loss, or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in computing Profit or Loss; (ii) any tax-exempt income not otherwise taken into account shall be included in computing Profit or Loss; (iii) any items that are specially allocated to a Member shall not be included in computing Profit or Loss; and (iv) any adjustments to taxable income or loss required in order to maintain capital account balances in compliance with Regulation § 1.704-1(b) shall be accounted for in computing Profit or Loss.

"*Regulation*" means the Federal Income Tax Regulations, including any temporary regulations, from time to time promulgated under the Code.

## ARTICLE 2

## ORGANIZATION

2.1    Organization.  The Company was formed by its organizer as a Georgia limited liability company by executing and delivering the Articles of Organization of the Company to the Secretary of State of the State of Georgia in accordance with the provisions of the Georgia Act.

2.2    Name.  The name of the Company is Columbia-MRA Park City Place, LLC.

2.3    Effective Date.  This Agreement shall be effective as of the date of filing of the Articles of Organization with the Secretary of State of the State of Georgia.

2.4    Term.  The existence of the Company shall commence on the Effective Date and shall continue until dissolved in accordance with the provisions of this Agreement or the Georgia Act.

2.5    Principal Place of Business.  The principal place of business of the Company shall be located at 1718 Peachtree Street, NW, South Tower, Suite 684, Atlanta, Georgia 30309, or at such other location as the Managing Member may from time to time determine.

2.6    Registered Agent and Office.  The initial registered agent of the Company shall be James S. Grauley and the initial registered office of the Company shall be 1718 Peachtree Street, NW, South Tower, Suite 684, Atlanta, Fulton County, Georgia 30309.  The Managing Member may from time to time designate a successor registered agent and registered office for the Company.

2.7    Nature of Business.  The Company may engage in any lawful business permitted by the Georgia Act.  The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business.

## ARTICLE 3

### MEMBERS' INTERESTS AND CAPITAL CONTRIBUTIONS

3.1    <u>Members and Interests</u>.  Each Member's name and Membership Interest shall be as set forth in <u>Exhibit A</u>, as amended from time to time to reflect Persons subsequently admitted as Members, if any, and their respective Membership Interests, and as further amended from time to time to reflect any other changes in the Company's membership.

3.2    <u>Initial Capital Contributions</u>.   Contemporaneously with the execution of this Agreement, each Member shall contribute the money or property shown in conjunction with its name as reflected in <u>Exhibit A</u> as its initial Capital Contribution to the Company.

3.3    <u>Capital Accounts</u>.  A Capital Account shall be maintained for each Member in accordance with Regulation § 1.704-1(b).

(a)    The Capital Accounts of the Members shall be maintained in accordance with the following provisions:

(i)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive shares of Profits, any items in the nature of income or gain which are specifically allocated pursuant to Article VI of this Agreement, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(ii)    To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of losses, any items in the nature of expenses or losses which are specifically allocated pursuant to Article VI of this Agreement, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)    In determining the amount of any liability for purposes of this Agreement, there shall be taken into account Code § 752(c) and any other applicable provisions of the Code and the Regulations.

(b)    If any Membership or Economic Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Membership or Economic Interest.

(c)    No Member shall be entitled to interest on its Capital Account or on its Capital Contributions to the Company; and, except as may otherwise be provided in this Agreement, no Member shall have the right to demand or to receive the return of all or any part of its Capital Account or of its Capital Contributions to the Company.

(d)     Upon the contribution to or distribution from the Company of property in connection with the admission to or withdrawal from the Company of a Member, or the liquidation of the Company, the assets of the Company may be revalued on the books of the Company to reflect the fair market value of such assets at the time of the occurrence of such event and, upon such revaluation, the Capital Accounts of the Members shall be adjusted in the manner required by Regulation §§ 1.704-1(b)(2)(iv)(f) and (g).     The determination to revalue the assets of the Company and adjustment of the Capital Accounts shall be made by the Managing Member.

## ARTICLE 4

## MANAGEMENT

4.1     Management.  The business and affairs of the Company shall be managed by its Managing Member.  The initial Managing Member of the Company shall be New Columbia Residential, LLC, a Georgia limited liability company.  Except as otherwise provided in this Agreement, the Managing Member shall have full and complete authority, power, and discretion to manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business.  Except as otherwise provided in this Agreement, no Member (other than the Managing Member or an officer who is a Member) shall have the authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to make any expenditures on behalf of the Company.

4.2     Election of Managing Member.     The Managing Member shall hold office indefinitely until Members representing at least fifty-one percent (51%) of the Membership Interests of the Company shall decide to elect a new Managing Member to succeed or replace the Managing Member or until the Managing Member's resignation, termination, or dissolution.

4.3     Compensation of the Managing Member.  The Managing Member may receive reasonable compensation, as determined from time to time by the Members of the Company, in consideration for its services as Managing Member.

4.4     Certain Powers of the Managing Member.  Without limiting the generality of Section 4.1 above, and subject to Section 4.5 below, the Managing Member shall have the absolute power and authority on behalf of the Company:

(a)     To acquire property from any Person as the Managing Member may determine.  The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Managing Member from dealing with that Person.

(b)     To borrow money for the Company from banks, other lending institutions, Members, or Affiliates of Members on such terms as the Managing Member deems appropriate.

(c)     To purchase liability, worker's compensation, and other insurance to protect the Company's property and business.

(d)    To hold and own real and/or personal property in the name of the Company and sell or dispose of the Company's assets in the ordinary course of the Company's business.

(e)    To invest any Company funds temporarily, including, but not limited to, in time deposits, short-term governmental obligations, commercial paper, or other investments.

(f)    To execute, on behalf of the Company, all instruments and documents, including, without limitation, checks, drafts, notes, and other negotiable instruments, mortgages, deeds to secure debt, security agreements, financing statements, documents providing for the acquisition, mortgage, or disposition of the Company's property, deeds, assignments, bills of sale, leases, and any other instruments or documents necessary, in the opinion of the Managing Member, to conduct the business of the Company.

(g)    To employ accountants, legal counsel, managing agents, other agents, or employees to perform services for the Company and to compensate them from Company funds, provided, that the appointment of a firm serving as the Company's independent accountants shall be subject to the prior written consent of Members representing a majority of the Membership Interests of the Company.

(h)    To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Managing Member may approve.

(i)    To do and perform all other acts as may be necessary or appropriate for the conduct of the Company's business.

(j)    To use the title of "President" of the Company, and to execute all instruments or other documents as "President" of the Company without the need of accompanying signatures from any other Member.

(k)    To designate in writing employees or agents of the Company as "officers" of the Company using titles commonly associated with officers of business corporations formed under the Georgia Business Corporation Code and to delegate to such persons all or a portion of the powers and authority granted to the Managing Member pursuant to this Section 4.4.

Unless authorized to do so by this Agreement or by the Managing Member, no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit, or to render it liable for any purpose.

4.5    _Major Decisions_.    Anything contained in this Agreement to the contrary notwithstanding, neither the Managing Member nor any employee or agent of the Company may perform any of the following duties without the prior written consent of Members representing a majority of the Membership Interests of the Company:

(a)    To spend in excess of $50,000 of the Company's funds.

(b)    To borrow money on behalf of the Company, whether from a commercial lender, one or more Members, or other Persons.

(c)    To hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of borrowed funds.

(d)    To sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan.

(e)    To make distributions of Net Cash Flow or to establish reserves in connection therewith, other than distributions described in this Agreement.

(f)    To merge the Company with or into another company or entity or to cause the Company to sell all or substantially all of its assets.

(g)    To change the primary business of the Company.

(h)    To authorize acts contrary to this Agreement.

(i)    To liquidate or dissolve the Company.

4.6    <u>Resignation</u>.  The Managing Member may resign at any time by giving written notice to the Members of the Company.  The resignation of the Managing Member shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  Except as otherwise expressly provided for in this Agreement, the resignation of a Managing Member who is also a Member shall not affect the Managing Member's rights as a Member and shall not constitute a withdrawal of such Member.

4.7    <u>Removal</u>.  The Managing Member may be removed at a meeting expressly called for such purpose by the affirmative vote of Members representing at least two thirds (⅔) of the Membership Interests of the Company.

4.6    <u>Vacancies</u>.  Any vacancy occurring for any reason in the office of Managing Member of the Company may be filled by the affirmative vote of Members representing a majority of the Membership Interests of the Company.

4.8    Action of Members.

(a)    To the extent that the Members are required or permitted to approve or take any action with respect to the Company, such action shall be approved or taken upon the affirmative vote of Members representing a majority, or such other percentage as set forth in this Agreement or in the Georgia Act, of the Membership Interests of the Members at a meeting at which a quorum is present.  The presence at a duly called meeting of Members who in person or by proxy hold a majority of the Membership Interests then held by Members of the Company shall constitute a quorum for the transaction of business.  If unanimous consent of the Members is required for any action

by this Agreement or by the Georgia Act, the consent of all of the Members shall be required.

(b)    Notwithstanding the foregoing, any such action required or permitted to be approved or taken at a meeting of Members may be taken without a meeting if the action is taken by Members having Membership Interests totaling not less than the minimum amount necessary to authorize or take the action at a meeting at which all Members were present and voting. The action must be evidenced by one or more written consents describing the action taken, signed by the Members, and delivered to the Company for inclusion with the Company's records.

## ARTICLE 5

## LIABILITIES AND DUTIES

5.1    Liability of Members and the Managing Member.    No Member or Managing Member shall be liable as such for liabilities of the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or under the Georgia Act shall not be grounds for imposing personal liability on the Members or Managing Member for liabilities of the Company.

5.2    Standard of Care.    In discharging its responsibilities and in acting on behalf of the Company, the Managing Member, and each Member, shall act in a manner he believes in good faith to be in the best interests of the Company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances. The Managing Member or Member may rely in good faith upon the records required to be maintained under Article VIII of this Agreement and upon such information, opinions, reports, or statements by any Member or by any other Person as to matters the Managing Member or Member reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, Profits or Losses of the Company. Neither the Managing Member nor any other Member shall be liable to the Company or to the other Members provided that such Managing Member or Member has complied with the standard of care contained in this Section 5.2. Neither the Managing Member nor any Member shall be liable to the Company or to any other Member for any loss or damage sustained by the Company or any Member except for loss or damage resulting from intentional misconduct, a knowing violation of law, or from a transaction for which such Member received a personal benefit in violation or breach of the provisions of this Agreement.

5.3    Conflict of Interest.

(a)    A Member or Managing Member shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, provided that either:

(i)    Such Person obtains the unanimous written consent of the disinterested Members prior to undertaking such act; or

(ii)    The transaction will not have a material adverse impact on the business or activities of the Company.

(b)    A Member or Managing Member does not violate a duty or obligation to the Company merely because his conduct furthers his own interest.  A Member or Managing Member may lend money to and transact other business with the Company. The rights and obligations of a Member or Managing Member who lends money to or transacts business with the Company are the same as those of a Person who is not a Member, subject to other applicable law.  No transaction with the Company shall be voidable solely because a Member or Managing Member has a direct or indirect interest in the transaction if either (i) the transaction is fair to the Company, or (ii) the disinterested Members, knowing the material facts of the transaction and the nature of the interest, authorize, approve, or ratify the transaction.

5.4    Bank Accounts.  The Managing Member may from time to time open bank accounts in the name of the Company, and the Managing Member and/or an authorized officer or designee shall be the sole signatories thereon.

## ARTICLE 6

## ALLOCATIONS OF PROFIT AND LOSS; TAX ITEMS

6.1    Allocations of Profit and Loss.    After making any special and regulatory allocations required below or as required by the Code or the Regulations, the net Profits and Losses and other items of income, gain, loss, and deduction shall be allocated among the Members in proportion to their Membership Interests in the Company.

6.2    Regulatory Allocations.  The following special allocations shall be made:

(a)    Allocations with Respect to Non-recourse Liabilities.

(i)    If in any year there is a net decrease in the "partnership minimum gain" (as determined under Regulation § 1.704-2(d)), then, prior to any other allocations pursuant to this Article VI, there shall be allocated to each Member items of income and gain for that year equal to that Member's share of the net decrease in company minimum gain (as determined under Regulation § 1.704-2(g)(2) and subject to the exceptions set forth in Regulation §§ 1.704-2(f)(2), (3), and (5)).  Allocations of income and gain pursuant to this provision shall be first made from gain recognized from the disposition of Company assets subject to non-recourse liabilities (within the meaning of Regulation § 752) to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. The foregoing is intended to be a "minimum gain chargeback" provision as described as Regulation § 1.704-2(f) and shall be interpreted and applied in accordance therewith.

(ii)    If during any year there is a net decrease in "partner non-recourse debt minimum gain" (as determined under Regulation § 1.704-2(i)(3)) then, in

addition to any amounts allocated pursuant to the preceding paragraph, any Member with a share of Member non-recourse debt minimum gain (as determined under Regulation § 1.704-2(i)(5)) as of the beginning of the fiscal year and subject to the exception set forth in Regulation § 1.704-2(i)(4)), shall be allocated items of income and gain for that year and for succeeding years (if necessary) equal to that Member's share of the decrease in Member non-recourse debt minimum gain. The foregoing is intended to be a "chargeback of member non-recourse debt minimum gain" required by Regulation § 1.704-2(i)(4) and shall be interpreted and applied in accordance therewith.

(iii) Beginning in the first taxable year in which there are allocations of "non-recourse deductions" (as defined in Regulation § 1.704-2(b)) and thereafter throughout the full term of the Company, such non-recourse deductions shall be allocated to the Members in accordance with and as a part of the allocations of Profit and Loss for such period. To the extent that losses, deductions, or expenditures of the Company are attributable to a particular "member non-recourse debt," such losses, deductions, and expenditures shall be allocated to the Member bearing the economic risk of loss for the liability in accordance with the rules of Regulation § 1.704-2(i).

(b) Qualified Income Offset. If a Member unexpectedly receives an adjustment, allocation, or distribution described in Regulation §§ 1.704-1(b)(2)(ii)(d)(4)-(6), thereby creating an unexpected deficit balance in the Member's Capital Account as of the end of the taxable year, such Member shall be allocated items of income and gain (consisting of a pro-rata portion of each item of Company income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. This provision is intended to be a "qualified income offset" as required by Regulation § 1.704-1(b) and shall be interpreted and applied in accordance therewith.

(c) Gross Income Allocation. In the event any Member has a deficit Capital Account balance at the end of any taxable year in excess of the amount such Member is obligated to restore pursuant to the penultimate sentences of Regulation §§ 1.704-2(g)(1) and 1.704-2(i)(5), each Member shall be specially allocated items of income and gain in the amount of such excess as quickly as possible provided that an allocation pursuant to this paragraph shall be made only if and to the extent the Member would have a deficit Capital Account balance after making all other allocations provided in this Article 6.3 as if the qualified income offset and this gross income allocation provision were not in effect.

(d) Section 754 Adjustments. To the extent that an adjustment to the tax basis of any Company asset pursuant to Code §§ 734(b) or 743(b) is required to be taken into account in determining Capital Accounts, pursuant to Regulation § 1.704-1(b)(2)(iv)(m), the amount of the adjustment shall be treated as an item of gain or loss, as appropriate, and the gain or loss shall be specially allocated to Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under that Regulation.

6.3    Limitation on Losses.  If any allocation of loss (or item thereof) would, but for this Section 6.3, create an impermissible Adjusted Capital Account Deficit with respect to a Member as of the end of the taxable year, such loss or deduction shall be allocated to the remaining Members in proportion to their Membership Interests specified in Exhibit A so as to allocate the maximum permissible loss to each Member under Regulation § 1.704-1(b)(2)(ii)(d).

6.4    Restorative Allocations.  To the extent any Company items have been allocated to any Members pursuant to the regulatory allocations or limits of this Article VI, thereby causing an unintended distortion among the Member's Capital Account balances, offsetting special allocations in the current year and/or subsequent years shall be made to those Members, or to other Members, sufficient to restore the net effect of all allocations to the intended Capital Account balances, unless otherwise prohibited by the Code or the Regulations.

6.5    Built-in Gain or Loss; Section 704(c) Allocations.  In the event that the book value of an item of Company property differs from its adjusted tax basis, taxable income, gain, loss, and deduction, including allocations of depreciation, amortization, and depletion, with respect to such property shall be made solely for federal and state income tax purposes (and not for Capital Account purposes) in a manner that takes into account the variation between book value and adjusted tax basis in accordance with Code § 704(c) and Regulation §§ 1.704-3, 1.704-1(b)(2)(4)(f), and 1.704-1(b)(4)(i), as appropriate.

6.6    Tax Items.

(a)    Withholding.  The Company is authorized to withhold from distributions made to, or with respect to allocations to, the Members and pay over to any appropriate taxing authority any amounts required to be so withheld pursuant to the Code and any provisions of federal, state, or local law and shall allocate such amounts to the Members with respect to which such amount was withheld.

(b)    Tax Elections.  The Managing Member shall have the authority to make any Company elections permitted under the Code for federal income tax purposes, including without limitation, elections as to methods of depreciation and any Code § 754 election.

(c)    Tax Matters Member.  If required under the Code or the Regulations to represent the Company, the Managing Member is hereby designated on behalf of the Company as the Tax Matters Member within the meaning of Code § 6231(a)(7) in administrative and judicial proceedings relating to the determination of Company items of income, deduction, and credit for federal income tax purposes.  The Managing Member may from time to time designate another Tax Matters Member provided that such Person is a Member.

## ARTICLE 7

## DISTRIBUTIONS

7.1    Distributions of Net Cash Flow.  Except as otherwise provided in this Agreement, or agreed upon by the Members, all or part of the Net Cash Flow, if any, may be distributed to

the Members, in accordance with their Membership Interests, at such times and in such amounts as shall be determined by the Managing Member in its sole discretion.

7.2    <u>Distributions to Fund Tax Liabilities</u>.  Unless otherwise agreed by the Members and to the extent that cash is available, the Managing Member may make cash distributions on or before April 1st of each year in amounts sufficient for each Member timely to pay all or substantially all tax liabilities that may be due in respect of the various distributive share items relating to the Company's income allocated to such Member for the immediately preceding year, after taking into account all distributions under Section 7.1 above for such year.    All computations to determine the required cash distributions hereunder shall be made by the Company's regular firm of certified public accountants based on (a) the assumption that each Member pays federal income taxes at the highest stated rate applicable to any individual under the Code, and state income taxes at the highest stated rate applicable to any individual in the State of Georgia, and (b) such other uniform assumptions as said accounting firm may deem fair, equitable, and appropriate under the circumstances.  All such computations shall be final and binding on the Member.

7.3    <u>Distribution in Liquidation of an Interest in the Company</u>.  If a Membership Interest in the Company is liquidated other than in connection with dissolution of the Company, the distribution to the Member whose interest is to be liquidated shall be equal to that Member's adjusted Capital Account balance, unless otherwise agreed by the Members.

7.4    <u>Liquidation and Dissolution</u>.  Liquidating distributions shall be made as provided in Article XI of this Agreement.

## ARTICLE 8

## ACCOUNTING; RECORDS; ELECTIONS; TAX ITEMS

8.1    <u>Fiscal Year</u>.  The fiscal year of the Company shall be the calendar year.

8.2    <u>Method of Accounting</u>.  The Company's books of account shall be maintained, and its income, gains, losses, deductions, and credits shall be determined and accounted for in accordance with such method of accounting as may be adopted by the Members representing a majority of the Membership Interests of the Company for federal income tax purposes.

8.3    <u>Financial Statements; Tax Return</u>.  Within ninety (90) days after the close of each fiscal year of the Company, the Company shall have its federal income tax return and Schedules K-1 for all Members and Economic Interest holders (if any) prepared and distributed. Financial statements shall be prepared and distributed only to the Members.  The financial statements shall be unaudited unless any of the Members request audited statements.

8.4    <u>Records</u>.  The Company shall maintain at its principal office all records required by law to be maintained, including a copy of this Agreement and all amendments hereto, the Articles of Organization and all amendments thereto, and the Company's federal, state, and local income tax returns, reports, and accompanying or supporting documentation.

8.5    Location of and Access to Books and Records.  The Company's books of account shall be kept at the principal office of the Company.  The Company's books shall be open to examination and copying by any Member or the authorized representative of any Member, at the expense of such Member and at any reasonable time, provided that the Member shall notify the Company at least five (5) business days prior to such inspection.

<h1 style="text-align:center">ARTICLE 9</h1>

<h2 style="text-align:center">ASSIGNMENT OF INTERESTS; ADMISSION; WITHDRAWAL</h2>

9.1    Generally.  No Member shall have the right to assign, transfer, give, sell, or pledge as security for borrowed funds all or any part of, or rights or interest in, such Member's Membership Interest in the Company or to make any other disposition of all or any portion of such Membership Interest to any Person or entity, including the Company, unless such transfer is made with the unanimous written consent of the Members or is otherwise specifically provided for in this Agreement.

9.2    Right of First Refusal.  Notwithstanding Section 9.1, any Member (a "Seller") may sell all or a portion of its Membership Interest (the "Offered Interest") pursuant to a bona fide offer, provided that Seller shall first offer to sell the Offered Interest to the other Members, with each other Member having the right to purchase a pro-rata portion of the Offered Interest, or in such proportions as the other Members may otherwise agree, at the purchase price and upon the terms and conditions of such bona fide offer.

(a)    The other Members shall have thirty (30) days after receipt of notice from Seller (which notice shall include a copy of the bona fide offer and the name(s), address(es), and telephone number(s) of the Person(s) making such bona fide offer) to notify Seller of their decision to purchase the Offered Interest upon the basis set forth above, and thirty (30) days thereafter to consummate such purchase unless the terms of the bona fide offer provide for a later closing.

(b)    If the other Members do not purchase all of the Offered Interest, Seller shall be free to sell it to the Person(s) making the bona fide offer, strictly in accordance with the terms thereof as communicated to the other Members, and provided that the purchaser delivers to the Company a written agreement to be bound by all the terms of this Agreement.

(c)    If Seller does not consummate the sale of the Offered Interest within three (3) months after the last date on which it could have been purchased by the other Members, then Seller shall not be permitted to sell the Offered Interest without again offering it to the other Members or obtaining the consent required by Section 9.1 above.

(d)    The other Members may permit the Company to join with them in the purchase of the Offered Interest pursuant to this Section 9.2 upon such terms and conditions as the Company and such other Members may agree.

9.3    Purchase Option of Company.  Upon the occurrence of a Member's Involuntary Withdrawal (such Member referred to as a "Withdrawing Member"), the Company shall have the

option to purchase the entire Membership Interest from the Withdrawing Member (or the personal representative, trustee, or other successor, as appropriate) for the Fair Market Value of such Membership Interest.

(a)    The option granted herein to the Company is exercisable by giving notice to the Withdrawing Member (or his personal representative, trustee, or other successor) within thirty (30) days of the date upon which the Fair Market Value of the Offered Interest is determined following the Member's Involuntary Withdrawal.

(b)    The Fair Market Value of the Withdrawing Member's Membership Interest offered pursuant to this Section 9.3 shall be determined by appraisal. The appraisal shall be conducted by an appraiser mutually agreed upon by the Withdrawing Member and the Company within fifteen (15) days after the date of the Withdrawing Member's Involuntary Withdrawal. If no such agreement is reached, the Withdrawing Member's Membership Interest shall be appraised by a single appraiser who is chosen by an appraiser appointed by the Withdrawing Member and an appraiser appointed by the Company. Such appraiser shall be appointed no later than thirty (30) days after the date of the Withdrawing Member's Involuntary Withdrawal. The expense of such appraisal shall be split equally between the Withdrawing Member and the Company. The appraisal shall be conducted as soon as reasonably possible following appointment of the appraiser. The determination of the Fair Market Value of the Withdrawing Member's Membership Interest shall be conclusive and binding upon all of the parties to this Agreement.

(c)    The closing of the purchase by the Company of the Withdrawing Member's Membership Interest shall take place at the office of the Company no more than sixty (60) days after the giving of the notice described in Subsection 9.3(a) hereof. At closing, the Company shall deliver to the Withdrawing Member (i) the purchase price (x) in cash or other immediately available funds, or (y) by an unsecured promissory note of the Company, with such note bearing simple interest at a rate equal to the average borne by five (5) year U.S. Treasury Notes for the last week ended in the preceding month as published in *The Wall Street Journal* in the section entitled "Key Interest Rates" with a term not exceeding five (5) years (payable quarterly in equal installments of principal with interest accrued thereon to date), and (ii) all documents that may be necessary or appropriate, in the opinion of counsel for the Company, to effectuate the transfer of such Membership Interest to the Members purchasing the Offered Interest, free and clear of all liens and encumbrances whatsoever with a general warranty of title.

9.4    Requirements of All Transfers. Notwithstanding any other provision hereof, there shall be no sale, assignment, or transfer of any Membership Interest unless the following requirements are met to the satisfaction of the Company: (i) the transfer will not require the registration of any Membership Interest under any federal or state securities laws; (ii) the transferee (other than the Company) delivers to the Company a written instrument agreeing to be bound by the terms of this Agreement; (iii) the transfer will not result in termination of the Company pursuant to Code § 708 unless otherwise agreed unanimously by the Members; and (iv) the transferee (other than the Company) supplies such other information, including the transferee's taxpayer identification number and initial tax basis in the transferred Membership Interest, as the non-transferring Members may require.

9.5     Transferees.  A transfer of a Membership Interest (by sale or otherwise) in accordance with this Article IX shall not entitle the transferee to become a substitute Member of the Company and shall not relieve a transferring Member of its responsibilities as a Member under this Agreement, unless and until the transferee is admitted as a Member of the Company in accordance with the provisions of Section 9.6 below.  Any such transferee not admitted as a Member of the Company shall be only an assignee of the Member's Economic Interest in the Company to the extent so transferred.

9.6     Admission of a Member.  No Person (whether a transferee or otherwise) shall be admitted as a Member of the Company unless such Person, and the terms and conditions of his admission, are unanimously approved by the Members, and such Person executes and delivers such instruments in form and substance reasonably satisfactory to the Members as may be necessary or desirable to effect such admission and to confirm the agreement of the new Member to be bound by all of the terms and conditions of this Agreement.

9.7     Additional Members.  From the date of formation of the Company, any Person acceptable to the Members by unanimous vote thereof may become a Member of this Company, either by the issuance of Membership Interests for such consideration as the Members, by unanimous consent shall determine, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Agreement.  No new Members shall be entitled to any retroactive allocation of losses, income, or expense deductions incurred by the Company.

9.8     No Withdrawal.  No Member shall be entitled to voluntarily withdraw from the Company, whether as provided in O.C.G.A. § 14-11-601(c) or otherwise, except with the prior written consent of all of the Members, which consent shall set forth the terms and conditions of such withdrawal.

9.9     Involuntary Withdrawal.  Immediately upon the occurrence of an Involuntary Withdrawal, the withdrawing Member shall thereupon cease to be a Member of the Company.  Such withdrawn Member or his successor, if any, shall hold only the withdrawn Member's Economic Interest in the Company.

## ARTICLE 10

## EXCULPATION AND INDEMNIFICATION

10.1     Exculpation.  A Member or Managing Member of the Company shall have no personal liability to the Company, to the Members, or to any other Person for monetary damages or otherwise for an act performed by the Member or Managing Member with respect to the Company; provided, however, that a Member or Managing Member shall continue to be liable for any intentional misconduct, a knowing violation of law, and any transaction for which the Member or Managing Member receives a personal benefit in violation or breach of any provision of this Agreement or the Articles of Organization of the Company.

10.2     Indemnification.  The Company shall indemnify each Member or Managing Member for any act performed by the Member or Managing Member with respect to Company matters, except for any intentional misconduct, a knowing violation of law, and any transaction

for which the Member or Managing Member receives a personal benefit in violation or breach of any provision of this Agreement or the Articles of Organization of the Company. The Company may, to the extent authorized from time to time by vote of the Members, grant rights to indemnification to any employee or agent of the Company, or to any appropriate Person involved with Company matters.

10.3    Relationship to Other Rights and Provisions Concerning Indemnification. The right to indemnification conferred in this Article X shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, this Agreement, the Articles of Organization of the Company, the vote of the Members or otherwise.

10.4    Insurance. The Company may procure and maintain insurance, at its expense, to protect itself, any Member, Managing Member, agent of the Company, or other appropriate Person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability, or loss under Georgia law.

## ARTICLE 11

### CESSATION, DISSOLUTION AND WINDING UP

11.1    Cessation.      Notwithstanding the provisions of O.C.G.A. § 14-11-601, the following shall constitute the sole events of a Member's cessation from the Company:

(a)    The transfer of a Member's entire Membership Interest and the admission of such transferee as a Member of the Company, or the transfer of a Member's entire Membership Interest to the Company in redemption or otherwise, as provided in this Agreement;

(b)    The voluntary withdrawal of a Member as provided in this Agreement; or

(c)    The Involuntary Withdrawal of a Member as provided in this Agreement.

Notwithstanding the provisions of O.C.G.A. § 14-11-405, a Member (or successor to a Member who has ceded from the Company) shall not be entitled to be paid the value of his Membership Interest in the Company upon an event of cessation, except to the extent and in the manner as may be provided by unanimous consent of the Members.

11.2    Dissolution. The Company shall be dissolved upon the occurrence of any of the following events:

(a)    The written agreement of Members representing two thirds (⅔) of the Membership Interests of the Company; or

(b)    A judicial or administrative dissolution or a dissolution by operation of law.

Notwithstanding O.C.G.A. § 14-11-602(4), an event of a Member's cessation shall not result in dissolution of the Company.

11.3    Effect of Dissolution.  Upon dissolution, the Company shall cease to carry on its business, except as permitted by O.C.G.A. § 14-11-605.  Upon dissolution, the Managing Member or liquidating trustee shall file a statement of commencement of winding up pursuant to O.C.G.A. § 14-11-606 and publish the notice permitted by O.C.G.A. § 14-11-608.  Provided, however, notwithstanding any other provision of this Article XI, if the Company is liquidated within the meaning of Regulation § 1.704-1(b)(2)(ii)(g), but no event specified in Section 11.2 above has occurred, the assets of the Company shall not be liquidated, the liabilities of the Company shall not be paid or discharged, and the affairs of the Company shall not be wound up. Instead, the Company shall be deemed to have distributed the assets of the Company in kind to the Members and Economic Interest owners, who shall be deemed to have assumed and taken subject to all liabilities of the Company, all in accordance with their respective Capital Accounts. Immediately thereafter, the Members and Economic Interest owners shall be deemed to have re-contributed the Company property and kind to the Company, which shall be deemed to have assumed and taken subject to all such liabilities.

11.4    Winding Up, Liquidation and Distribution of Assets.

(a)    Upon dissolution, an accounting shall made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities, and operations, from the date of the last previous accounting until the date of dissolution. The Managing Member or the liquidating trustee shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Managing Member or the liquidating trustee shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managing Member may determine to distribute any assets to the Members in kind);

(ii)    Allocate any Profit or Loss resulting from such sales to the Members in accordance with Article VII of this Agreement;

(iii)    Discharge all liabilities of the Company, including liabilities to Members who are creditors, to the extent otherwise permitted by law, other than liabilities to Members for distributions, and establish such reserves as may be reasonably necessary to provide for contingent or other liabilities of the Company; and

(iv)    Distribute the remaining assets in the following order:

(A)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by unanimous agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to provisions of this Agreement to reflect such deemed sale.

(B) The positive balance (if any) of each Member's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Managing Member or liquidating trustee, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Members with respect to their Capital Accounts shall be made in accordance with the time requirement set forth in Regulation § 1.704-1(b)(2)(ii)(b)(2).

(C) Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Regulation § 1.704-1(b)(2)(ii)(g), if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations, and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(D) Upon completion of the winding up, liquidation, and distribution of assets, the Company shall be deemed terminated.

(E) The Managing Member or the liquidating trustee shall comply with any requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

11.5    Certificate of Termination. When all debts, liabilities, and obligations have been paid and discharged, or adequate provisions have been made therefor, and all of the remaining property and assets have been distributed to the Members, a certificate of termination may be executed and filed with the Secretary of State of the State of Georgia in accordance with O.C.G.A. § 14-11-610.

11.6    Return of Contribution; Non-Recourse to Other Members. Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE 12

### REPRESENTATIONS AND WARRANTIES OF MEMBERS

EACH OF THE MEMBERS HEREBY ACKNOWLEDGES, REPRESENTS AND WARRANTS TO THE COMPANY AND TO EACH OF THE OTHER MEMBERS THAT THE MEMBER IS ACQUIRING A MEMBERSHIP INTEREST FOR HIS OWN ACCOUNT AND FOR INVESTMENT PURPOSES ONLY, AND NOT WITH A VIEW TO OR FOR THE RESALE, DISTRIBUTION OR FRACTIONALIZATION THEREOF, IN WHOLE OR IN PART, AND NO OTHER PERSON HAS A DIRECT OR INDIRECT BENEFICIAL INTEREST IN THE COMPANY BEING ACQUIRED BY THE MEMBER. EACH MEMBER AGREES THAT HIS MEMBERSHIP INTEREST, OR ANY PORTION THEREOF, SHALL NOT BE SOLD WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS OR EXEMPTIONS THEREFROM. EACH MEMBER FURTHER ACKNOWLEDGES THAT HE MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS AND THEREFORE CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

## ARTICLE 13

### MISCELLANEOUS

13.1    Notices.    Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and shall be deemed to have been given (i) when delivered, if personally delivered or sent by overnight courier (such as FedEx), (ii) upon successful transmission, if sent by facsimile, or (iii) within three (3) business days after the date postmarked by the United States Postal Service. Such notices shall be sent, if to the Company, to the Principal Office of the Company and, if to the Members, to the address and facsimile number of the Members as shown in Exhibit A or in the records of the Company.

13.2    Successors and Assigns.    This Agreement, and each and every provision hereof, shall be binding upon and shall inure to the benefit of the Members and their respective successors, heirs, legal representatives, and assigns to the extent permitted under this Agreement, and each Member agrees, on behalf of himself and his permitted successors, to execute any instruments which may be necessary or appropriate to carry out and execute the purposes and intentions of this Agreement, and hereby authorizes and directs his permitted successors to execute any and all such instruments. Notwithstanding any other provision herein, each and every permitted successor to any Member, whether such successor acquires such interest by way of gift, purchase, foreclosure, or by any other method permitted herein, shall hold such interest subject to all of the terms and conditions of this Agreement. It is the intention of the Members that, during the term of this Agreement, the rights of the Members and their permitted successors, as among themselves, shall be governed by the terms of this Agreement, and that the right of any Member or permitted successor to assign, transfer, sell, or otherwise dispose of or

deal with his Membership Interest in the Company shall be subject to the limitations and restrictions of this Agreement.

13.3   Amendment.  No change, modification, or amendment of this Agreement shall be valid or binding unless such change or modification shall be in writing and signed by all of the Members.

13.4   No Right to Dissent.  No Member shall be entitled to dissent and obtain payment of the value of his Membership Interest in the Company, pursuant to O.C.G.A. § 14-11-1001, *et. seq.*, or otherwise, with respect to any action taken by the Company, the Managing Member or the Members.

13.5   Other Instruments.  The Members covenant and agree that they will execute such other and further instruments and documents as are or may become necessary or convenient from time to time to effectuate and carry out the letter and intent of this Agreement.

13.6   No Waiver.  The failure of any Member to insist upon strict performance of any covenant or obligation under this Agreement shall not be a waiver of such Member's right to demand strict compliance therewith in the future.

13.7   Integration.  This Agreement constitutes the full and complete agreement of the Members with respect to the subject matter hereof.

13.8   Captions, Etc..  Titles or captions of Articles and Sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision hereof. References in this Agreement to particular Articles or Sections are references to Articles or Sections of this Agreement unless otherwise stated.

13.9   Number and Gender.  Whenever required by the context, the singular number shall include the plural, and vice versa, and the masculine gender shall include the feminine and neuter, and vice versa.

13.10  Counterparts.  This Agreement may be executed in any number of counterparts, all of which shall constitute for all purposes one and the same Agreement.

13.11  Severability.   In the event any provision hereof is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other provision.

13.12  Applicable Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

13.13  Time of the Essence.  Time is of the essence with respect to each and every covenant, agreement and obligation under this Agreement.

**IN WITNESS WHEREOF,** the undersigned Members have executed this Operating Agreement of Columbia-MRA Park City Place, LLC on the day above first written.

MEMBERS:

**NEW COLUMBIA RESIDENTIAL, LLC,** a Georgia limited liability company

By: _____

James S. Grauley, President and Manager

**MOTHERS REBUILDING ATLANTA, INC.,** a Georgia non-profit corporation

By: _____

Name: _____

Title: _____

[CORPORATE SEAL]

# EXHIBIT A

| Name of Members | Membership Interests | Profits Cash Flow |
|---|---|---|
| New Columbia Residential, LLC<br>1718 Peachtree Street, NW<br>Suite 684, South Tower<br>Atlanta, Georgia 30309 | 75% | 75% |
| Mothers Rebuilding Atlanta, Inc.<br>P.O. Box 19202<br>Atlanta, Georgia 31126 | 25% | 25% |
| **Total** | **100%** | **100%** |

Case 14-05354-mbm    Doc 1    Filed 11/05/14    Entered 11/05/14 15:53:29    Desc Main
Document    Page 47 of 84

001090

| | | Mothers Rebuilding Atlanta Inc. | | | 11/1/2013 | |
| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
| 10/1/2013 | Bill | 110103 | 25,000.00 | 25,000.00 | | 25,000.00 |
| | | | | | Check Amount | 25,000.00 |

Wachovia Checking    Park City Place - Development Fee                              25,000.00



## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

**Proposed Ownership Entity** (This entity must be formed as of date of application)

Entity Name: <u>Columbia-MRA Park City Place, LLC</u>    Federal ID #:    <u>pending</u>

Legal Form: ☐ Individual    ☐ General Partnership    ☐ Limited Partnership

☒ For-Profit Corporation    ☐ Non-Profit Corporation    ☐ Other:___ *TAX ID*

General Partner Information (if applicable): (List Managing General Partner on first line.) *Not MRA*

| Name: | New Columbia Residential LLC | Fed ID or Soc Sec #: | 26-444-6472 | Owns: | 75% |
|---|---|---|---|---|---|
| Name: | Mother's Rebuilding Atlanta, Inc. | Fed ID or Soc Sec #: | 27-4471138 | Owns: | 25% |
| Name: | Click here to enter. | Fed ID or Soc Sec #: | Click here to enter. | Owns: | Click here to |

## II.    Development Team Information    (Name and Phone Number)

| Team Member | Name | Phone Number | Check if MBE or WBE |
|---|---|---|---|
| **Contractor** | TBD | Click here. | ☐ |
| **Property Manager** | New Columbia Residential Property Management | 404-874-5000 | ☐ |
| **Consultant** | Click here to enter text. | Click here. | ☐ |
| **Owner's Attorney** | Hunter Maclean, Exley & Dunn | 912-944-1635 | ☐ |
| **Tax Attorney** | Cohn Reznick, LLP | 404-847-9447 | ☐ |
| **Closing Attorney** | Hunter Maclean, Exley & Dunn | 912-944-1635 | ☐ |
| **Tax Accountant** | Cohn Reznick, LLP | 404-847-9447 | ☐ |
| **Physical Needs Assessor** | United Consulting | 770-209-0029 | ☐ |
| **Architect** | TBD | Click here. | ☐ |

Does the developer or owner hold a direct or indirect financial interest in any development team member listed above?    ☒ Yes    ☐ No

If yes, provide details of the relationship: New Columbia Residential Property Management and New Columbia Residential are both owned by Jim Grauley

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

and Noel Khalil.

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

**Non-Profit Determination\*\***

To qualify for non-profit preference, a non-profit must materially participate in the development and operation of the project throughout the compliance period. Within the meaning of IRS 469(h), "a(non-profit) shall be treated as materially participating in an activity only if the (nonprofit) is involved in the operations of the activity on a basis that is regular, continuous, and substantial."

Indicate type of non-profit participating in this development:

☐IRS 501(a)   ☒IRS 501(c)(3)   ☐IRS 501(c)(4)   ☐IRS 501(c)(3)   ☐Other

Is "fostering low and moderate income housing" listed among the purposes of the non-profit in its Articles of Incorporation?   ☒Yes   ☐No
**\*(PLEASE SEE ADDITIONAL DOCUMENTATION INCLUDED IN THIS TAB)**
## III.   Development Plan Information

| | # Units | Sq. Ft. | # Units | # Units | Sq. Ft. |
|---|---|---|---|---|---|
| Total # Units Planned | 9 | 1,612 | # Market Rate Units | Click. | . |
| Total Number Low-Income | 9 | . | Project Based | Click. | . |
| Tax Credit 60% | No | . | Home | 2 | 3,224 |
| Other | . | . | Other (80% AMI) | 7 | 11,284 |

Unit Targeting:

☐ Elderly   # units.   ☒ Family   9 units   ☐ Disabled   # units.
☐ Other   Category          # Units.

Housing Types Planned (√ all that apply):

☐Single Family Detached   ☒Row House/Townhouse   ☐Two Family Detached

☐Garden Apartments   ☐Multi-Story, No Elevator   ☐Multi-Story, Elevator

Type of Occupancy Planned:

☒ Standard Rental   ☐ Transitional   ☐ Single Room Occupancy
☐ Condominium   ☐ Cooperative   ☐ Other:

Recreational Facilities Planned: None

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

Commercial Space Planned:___None

Accessory Building Planned:__None

Development Security Planned:__Gated and controlled access

| | | | |
|---|---|---|---|
| Total Number of Buildings Planned: | 1 | Total Number of Parking Spaces | 14 |
| Total Floor Area Planned (sq. ft.) | 14,500 | Non-Residential Floor Area Planned: | 0 |

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

### Energy and Equipment Information

**Heating System** (√ one): ☐ Electric Baseboard    ☐ Central Forced Air
☐ Gas    ☐ Electric    ☒ Heat Pumps    ☐ Wall Heaters
Efficiency Rating: _____    ☐ Other:

**Air Conditioning System** (√ one):    ☐ None Provided    ☐ Window Units
☐ Gas    ☒ Electric    ☐ Central Forced Air    ☐ Motel-Style Units
Efficiency Rating: _____    ☐ Heat Pumps

**Domestic Hot Water** (√ one):    ☐ Single Units Supply    ☐ Shared Supply
☐ Gas    ☒ Electric
Efficiency Rating:

**Equipment Included with Low and Very Low-Income Units** (√ items provided):
☒ Range    ☒ Refrigerator    ☒ Garbage Disposal    ☒ Dishwasher
☒ Kitchen Exhaust    ☒ W/D Hook-ups    ☐ Washing Machine    ☐ Dryer
☐ On-Site Laundry    ☒ Security Alarm    ☐ Other

**Equipment Included with Other Units** (√ items provided):
☒ Range    ☒ Refrigerator    ☒ Garbage Disposal    ☒ Dishwasher
☒ Kitchen Exhaust    ☒ W/D Hook-ups    ☐ Washing Machine    ☐ Dryer
☐ On-Site Laundry    ☒ Security Alarm    ☐ Other

### IV.    Site Information** (Please See Additional Information Included in this Section)

Form of Site Control (√ one):    ☐ Option    ☒ Contract    ☐ Deed

Date of Acquisition:  Click to enter date

Expiration date of option or contract:  Click here to enter a date.    Price Total:
Site Area:  Enter $   acres    Seller's Phone Number:

Seller's Name:    Click to enter text

Mailing Address:    Click to enter text
City:    City here.    State:    City here.    Zip:    Zip.

# DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

## Site Information - Continued

Does current site zoning allow multifamily residential use? ☒ Yes ☐ No

If current zoning does not allow this use, has a rezoning application been filed? ☐ Yes ☐ No

Is the site currently connected to:

| | | |
|---|---|---|
| Public Water Supply? | ☒ Yes ☐ No | Cable Television System? ☒ Yes ☐ No |
| Public Sewer System? | ☒ Yes ☐ No | Telephone System? ☒ Yes ☐ No |
| Natural Gas Distribution System? | ☒ Yes ☐ No | Electric Power System? ☒ Yes ☐ No |

Are the following features present at the proposed development site?

| | | | |
|---|---|---|---|
| All or part in 100-yr. floodplain? | ☐ Yes ☒ No | Standing water? | ☐ Yes ☒ No |
| Railroad tracks within 300 feet? | ☐ Yes ☒ No | Creek, lake, river frontage? | ☐ Yes ☒ No |
| High tension wires? | ☐ Yes ☒ No | Ravines or steep grades? | ☐ Yes ☒ No |
| Major rock outcroppings? | ☐ Yes ☒ No | Airport clear zone? | ☐ Yes ☒ No |
| Trash or imported fill? | ☐ Yes ☒ No | Unstable soil conditions? | ☐ Yes ☒ No |
| Explosive materials within 300 ft? | ☐ Yes ☒ No | High noise levels? | ☐ Yes ☒ No |
| Hazardous Materials | ☐ Yes ☒ No | Toxic Waste Sites? | ☐ Yes ☒ No |

Identify any other unusual site features:

Click here to enter text.

DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE
APPLICATION

## V.    Development Rents

Enter Maximum Gross Rents (including Tenant Paid Utilities) for this project. See Appendix G for 2012 HOME Rent Limits

| Unit Size | 0-BR | 1-BR | 2-BR | 3-BR | 4-BR |
|---|---|---|---|---|---|
| High Home Rents | Click | Click. | 912 | 1109 | Click |
| Low HOME Rents | Click | Click | 808 | 933 | Click |

## Monthly Utility Allowances

Complete the following table of allowances for tenant-paid utilities using Utility Allowance Table provided by the Housing Authority (Appendix A)

| Expense Item | Type | To Be Paid By | | Allowance by number of bedrooms | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | 0-BR | 1-BR | 2-BR $37 | 3-BR $42 | - BR |
| Heating | - | ☐Owner | ☒Tenant | | | | | |
| Cooking | - | ☐Owner | ☒Tenant | - | - | $39 | $54 | - |
| Hot Water | - | ☐Owner | ☒Tenant | - | - | $39 | $54 | - |
| Lighting | | ☐Owner | ☒Tenant | - | - | $40 | $45 | - |
| Air Conditioning | | ☐Owner | ☒Tenant | - | - | $36 | $45 | - |
| Water/Sewer | | ☐Owner | ☒Tenant | - | - | $79 | $109 | - |
| Trash | | ☒Owner | ☐Tenant | - | - | N/A | N/A | - |
| Refrigerator | | ☐Owner | ☒Tenant | - | - | $40 | $45 | - |
| **Total monthly tenant paid utilities** | | | | - | - | $310 | $394 | - |

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

**Low Income Units (80% of Area Median Income)**
Enter your proposed net rents for units targeted for low-income households in this table:

| Unit Type | Number of Units | Monthly Net Rent per Unit | Total Monthly Rent for Unit Type | Average Floor Area (square feet) |
|---|---|---|---|---|
| 3-BR | 3 | $ 900 | $ 2,700 | -1612 |
| 2- BR | 4 | $ 800 | $ 3,200 | -1612 |
| - BR | - | $ - | $ - | - |
| - BR | - | $ - | $ - | - |
| Non-Rental Income: ___Identify Source | | | $ 0 | |
| Less Vacancy Allowance of 10% | | | ($ 5,900 ) | |
| Total Monthly Income from Low-income Units | | | $ 5,310 | |
| What is the estimated annual increase in net rent? | | | 2 % | |

**Note:  Net rents equal the monthly gross rents less the tenant paid utilities.**

**Very Low-Income Units (50% of Area Median Income)**
Enter your proposed net rents for units targeted for very low-income households in this table:

| Unit Type | Number of Units | Monthly Net Rent per Unit | Total Monthly Rent for Unit | Average Floor Area (square ft) |
|---|---|---|---|---|
| 3 BR | 1 | $ 800 | $800 | 1612 |
| 2 BR | 1 | $ 700 | $ 700 | 1612 |
| - BR | - | $ - | $ - | - |
| - BR | - | $ - | $ - | - |
| Non-Rental Income: ___Identify Source | | | $ - | |
| Less Vacancy Allowance of - 10 % | | | ($ 150 ) | |
| Total Monthly Income from Very Low-Income Units | | | $ 1,350 | |
| What is the estimated annual increase in net rent? | | | 2 % | |

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

**Other Units**

Enter your proposed net rents for all unrestricted units in this table:

| Unit Type | Number of Units | Monthly Net Rent per Unit | Total Monthly Rent for Unit Type | Average Floor Area (square ft) |
|---|---|---|---|---|
| - BR | - | $ - | $ - | - |
| - BR | - | $ - | $ - | - |
| - BR | - | $ - | $ - | |
| - BR | - | $ - | $ - | - |
| Non-Rental Income: ___ Identify Source | | $ - | | |
| Less Vacancy Allowance of - % | | ($ - ) | | |
| Total Monthly Income from Very Low-Income Units | | $ - | | |
| What is the estimated annual increase in net rent? | | - % | | |

**Employee and Model Units**

Check (√) one for each of the following selections:

Number of employee units planned: -   Number of permanent model units planned:

☐ Included in unit count   ☐ Included in unit count

☐ Common space   ☐ Common space (not eligible for tax credits)

| Unit Type | Number of Units | Monthly Net Rent per Unit | Total Monthly Rent for Unit Type | Average Floor Area (square feet) |
|---|---|---|---|---|
| - BR | - | $ - | $ - | - |
| - BR | - | $ - | $ - | - |
| Total Monthly Rental Income Foregone | | | ($ - ) | |

**Rental Assistance Information**

Do you expect to receive a commitment for any rental subsidies for this development?   ☐ Yes   ☐ No

If you answered yes, please √ the type of subsidy expected:

☐Section 8 Moderate Rehabilitation

☐Section 8 Project Based Assistance   ☐Other:

Number of units expected to receive assistance:   -

Number of years remaining in assistance contract:   -

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

### Housing Authority (HA) Waiting List Information(optional)

Describe households on waiting list for public housing (does not include waiting list for Section 8 program) to be targeted. Include information related to number of households on waiting list and number or percent who could be served by proposed project based on family size, income, and rent they can afford to pay.

Click here to enter text.

Describe the number of units, unit mix, and rent structure to be implemented to specifically target need identified above.

This development will host 9 townhome units, 2 of which will be made available for tenants at or below 50% AMI affordability. The other townhomes will provide rental rates consistent with 80% AMI. The unit mix of these townhomes is 4 3-bedroom and 5 2-

### VI.    Relocation Information

Relocation is the moving of residential tenants from their original leased space.

Will your development plans require any tenants to move temporarily?    ☐Yes   ☒ No

Will your development plans require any tenants to move permanently?    ☐Yes   ☒ No

### VII.   Development Subsidy Information

If any of your development financing sources are provided directly or indirectly with Federal, State, or local government funds, enter the amounts in the following table:

| LOANS | | GRANTS | |
|---|---|---|---|
| Tax Exempt Bonds | $    Click | C.D.B.G. | $ Click |
| C.D.B.G. | $    Click | Housing Trust Fund | $ Click |
| Housing Trust Fund | $    Click | HOME | $ Click |
| HOME | $    1,500,000 | State Government | $ Click |
| Other | $    Click | Local Government | $ Click |
| | | Other | $ Click |

If tax-exempt financing is to be used, what percentage of the total cost does it cover?    **%** Click

If taxable bond financing is to be used, enter amount of expected proceeds.    **$** Click here to enter text.

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

**Credit Enhancements**

Will the permanent financing have any kind of credit enhancement?    ☐Yes    ☐No

If yes, what kind of enhancement?

**Existing Subsidies in Developments to be Acquired**

Does your development plan include acquisition of units with existing subsidies?  ☐Yes  ☒No

If yes, please indicate the kind of existing subsidy (√ all that apply):

☐Section 221(d)(3) Below Market Interest Rate          ☐Section 236
☐Section 8 Project Based Assistance                    ☐Other

Does your development plan seek to preserve federally-assisted low-income housing which would otherwise convert to market rate use through mortgage prepayment, foreclosure or expiring subsidies?

☐Yes ☒No

**VIII.    Supportive Services Information** Please provide the information below in a attachment)

If you plan to provide supportive services to your tenants, please provide the following:

- Description of the tenant population to be served:

- Description of the services to be provided and the rationale for service selection:

- Description of the intended benefits of the services to be provided:

- Description of how services are to be provided:

- Description of service provider and financing:

# DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

## IX.    Financing and Development Schedule

For each item in the chart below, enter the month and year when that item is expected to be accomplished.  If an item does not apply to your development, enter N/A.

| SITE | ACTIVITY | MONTH/YEAR |
|---|---|---|
| | Option<br>Contract<br>Closing<br>Zoning Approval<br>Site Analysis | Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy |
| CONSTRUCTION FINANCING | Source: ____ HOME<br>Application Submission<br>Conditional Commitment<br>Firm Commitment | 6/2013<br>6/2013<br>6/2013<br>TBD |
| PERMANENT FINANCING | Source:<br>Application Submission<br>Conditional Commitment<br>Firm Commitment | Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy |
| | Source:<br>Application Submission<br>Conditional Commitment<br>Firm Commitment | Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy |
| | Source:<br>Application Submission<br>Conditional Commitment<br>Firm Commitment | Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy |
| | Source:<br>Application Submission<br>Conditional Commitment<br>Firm Commitment | Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy<br>Mm/yyyy |
| PLANS | Preliminary Drawings<br>Working Drawings | Mm/yyyy<br>Mm/yyyy |
| CONSTRUCTION LOAN CLOSING | TBD (predicated on firm HOME loan commitment from Dekalb) | Mm/yyyy |
| CONSTRUCTION START | TBD (predicated on firm HOME loan commitment from Dekalb) | Mm/yyyy |
| LEASE-UP START | TBD (predicated on firm HOME loan commitment from Dekalb) | Mm/yyyy |
| CONSTRUCTION COMPLETE | TBD (predicated on firm HOME loan commitment from Dekalb) | Mm/yyyy |
| FULL LEASE-UP | TBD (predicated on firm HOME loan commitment from Dekalb) | Mm/yyyy |

# DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

## X.    Certification

The undersigned applicant(s) hereby each certify that, to the best of my/our knowledge, all of the information in this application and all supporting documentation is correct, complete and accurate. I/We further recognize and accept our obligation to notify the DeKalb County Community Development Department immediately if I/we become aware of any subsequent events or information which would change any statements or representations previously submitted to DeKalb County.

DATE: _____     Applicant Name:

By:

Print Firm Name

Title:

Authorized Signature

DATE: _____     Applicant Name:

By:

Print Firm Name

Title:

Authorized Signature

# DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION

## I.    General Information

### Development Information

Development Name:    Park City Place

Address:    <u>Please See Attached</u>

<u>Click here to enter text.</u>

<u>Atlanta</u>                    , Georgia        <u>30316</u>

Census Tract:    <u>237.00</u>

Types of development activities planned (√ all that apply):

☒ Acquisition        ☒ New Construction (Future)        ☒ Rehabilitation  <u>67</u> % occupied

**Amount of Assistance Requested:  1,500,000** _____

### Developer Information

Firm Name:   <u>Columbia-MRA Park City Place, LLC</u>        Federal ID #:   <u>Pending</u>
Contact Person   <u>Jim Grauley</u>                Title:   <u>Managing Member</u>
Phone:   <u>404-419-1432</u>              FAX:   <u>(404) 874-0379</u>

Email:   <u>jgrauley@columbiares.com</u>            Website:   <u>www.columbiares.com</u>
Address:   <u>1718 Peachtree St.</u>
         <u>Suite 684</u>

<u>Atlanta</u>                    , **Georgia**        <u>30309</u>

Is this firm a qualified Minority-owned Business Enterprise (MBE)?  ☐ Yes  ☒ No

Is this firm a qualified Woman-owned Business Enterprise (WBE)?  ☐ Yes  ☒ No

IRS Department of the Treasury
Internal Revenue Service

P.O. Box 2508
Cincinnati  OH  45201

In reply refer to:  0248162362
Dec. 06, 2013  LTR 4168C  0
58-2410639  000000 00

00019596
BODC: TE



MOTHERS REBUILDING ATLANTA INC
% CHEREE NEWSON-PACE
PO BOX 19202
ATLANTA  GA  31126

01647

        Employer Identification Number:  58-2410639
                   Person to Contact:  Mr. McQueen
           Toll Free Telephone Number:  1-877-829-5500

Dear Taxpayer:

This is in response to your Nov. 26, 2013, request for information
regarding your tax-exempt status.

Our records indicate that you were recognized as exempt under
section 501(c)(3) of the Internal Revenue Code in a determination
letter issued in May 1995.

Our records also indicate that you are not a private foundation within
the meaning of section 509(a) of the Code because you are described in
section(s) 509(a)(1) and 170(b)(1)(A)(vi).

Donors may deduct contributions to you as provided in section 170 of
the Code. Bequests, legacies, devises, transfers, or gifts to you or
for your use are deductible for Federal estate and gift tax purposes
if they meet the applicable provisions of sections 2055, 2106, and
2522 of the Code.

Please refer to our website www.irs.gov/eo for information regarding
filing requirements. Specifically, section 6033(j) of the Code
provides that failure to file an annual information return for three
consecutive years results in revocation of tax-exempt status as of
the filing due date of the third return for organizations required to
file. We will publish a list of organizations whose tax-exempt
status was revoked under section 6033(j) of the Code on our website
beginning in early 2011.





# HOME INVESTMENT PARTNERSHIPS ACT PROGRAM (HOME)

# DEKALB COUNTY AFFORDABLE MULTI-FAMILY RENTAL HOUSING

# APPLICATION PACKAGE

### REVISED: JANUARY, 2013

Contact
DeKalb County Human &Community Development Department
404-286-3308
Melvia Richards
404-286-3366
mwrichards@dekalbcountyga.gov



# Table of Contents

| General Information | Page |
|---|---|
| Introduction | 3 |
| Program Description | 4 |
| HOME Loan Conditions | 4 |
| Application Processing and Project Implementation Procedures and Requirements | 5 |
| Application Procedures and Requirements for Housing Authorities | 9 |
| Post Award Procedures | 9 |
| Loan Closing and Construction Monitoring | 9 |
| Property Standards | 11 |
| Section 3 Compliance | 11 |
| HOME Compliance Monitoring | 13 |

| Application Forms | Number |
|---|---|
| Certification and Applicability of False Claims Act | |
| Multi-family Affordable Housing Application Instructions & Form | 100 |
| Experience of Owner & Developer | 105 |
| Experience Summary of Property Manager | 106 |
| Nonprofit Eligibility Questionnaire | 110 |
| Rent Register | 115 |
| Building Unit Profiles | 116 |
| Management Agent Questionnaire | 120 |
| Annual Operating Expense Budget | 125 |
| Source of Funds & Guide for Forms 130, 135, 140 | 130 |
| Source and Uses of Funds | 135 |
| After Tax Income Projections | 140 |

**HOME INVESTMENT PARTNERSHIPS PROGRAM - DEKALB COUNTY MULTI-FAMILY APPLICATION PACKAGE**

## Attachments

| | |
|---|---|
| Attachment A: | Application Policies |
| Attachment B: | Supporting Documentation |
| Attachment C: | Funding Priorities |

## Appendices & References                                                    Number

| | |
|---|---|
| Current Utility Allowance | A |
| Current Rent Limits | B |
| Current Income Limits | C |
| Current 221(d)3 Limits | D |
| Tenant Selection Policies & Criteria | F |
| Prohibited Lease Provisions | G |
| NEPA Clearance | H |
| Affirmative Marketing to Assure Fair Housing | I |
| Davis-Bacon, Federal Labor Law & Section 3 | J |
| HOME Regulations (available online) | www.hud.gov |
| Compliance in HOME Rental Properties (available online) | www.hud.gov |

# INTRODUCTION

HOME is authorized under Title II of the Cranston-Gonzalez National Affordable Housing Act, as amended. Program regulations can be found at 24 CFR Part 92.  HOME provides formula grants to States and localities, like DeKalb County, that communities use—often in partnership with local nonprofit groups—to fund a wide range of activities that build, buy, and/or rehabilitate affordable housing for rent or homeownership or provide direct rental assistance to low-income people.

HOME is the largest federal block grant to state and local governments that is designed exclusively to create affordable housing for low-income households. Each year, HUD allocates approximately $2 billion to States and hundreds of localities nationwide. The entire HOME allocation (100% of all HOME funds) must assist households with incomes less than 80% of average median income.

The primary goal for the use of HOME funds in DeKalb County is to preserve existing housing and promote the development of new affordable housing.  The County has adopted a holistic approach to housing and related resident services that encourage the development of innovative approaches to the design and implementation of affordable housing projects and linkages between service providers and households, in order to enhance quality of life, promote upward mobility, and foster economic self-sufficiency among families who reside in HOME-assisted properties.

The DeKalb County Consolidated Plan identifies low-income households, overcrowded households, residents of substandard housing, low-income senior citizens, and families paying a disproportionate percentage of their income towards rent and utilities as the County's populations most in need of housing assistance.  The DeKalb Consolidated Plan identifies the HOME Program as a primary source of funding to be used to the greatest extent possible when its use is consistent with the County's Criteria for Affordable Housing as outlined in the Consolidated Plan.  In accord with this plan, the County has obligated HOME funds to programs that provide down payment assistance for homebuyers, tenant based rental assistance, single-family owner-occupied housing rehabilitation, and multi-family project construction and rehabilitation.

This application is designed to assist the County in committing its HOME funds to developers and Community Housing Development Organizations (CHDOs) who request gap financing for compliant, sustainable, cost-effective, multi-family projects that are consistent with the County's Consolidated Plan.  Thorough application completion enables the County to determine that the project is compliant with HUD's requirements, fulfills the County's underwriting requirements, and is consistent with the Consolidated Plan.  By thoroughly completing the application, the applicant can reduce the evaluation period and increase the probability of project funding

Additional information regarding HOME and the DeKalb County Consolidated Plan can be found at the websites listed below.
   HOME – www.hud.gov
   DeKalb Consolidated Plan - www.co.dekalb.ga.us/commdev/consolidatedPlans.html

HOME INVESTMENT PARTNERSHIPS PROGRAM - DEKALB COUNTY MULTI-FAMILY APPLICATION PACKAGE

## DEKALB COUNTY PROGRAM DESCRIPTION

The DeKalb County Home Investment Partnerships Program (HOME), in compliance with HOME Investment Partnership Act regulations at 24 CFR 92 (see attached Appendix F), is directed toward expanding the availability of affordable rental stock to low and very low-income persons, as defined by the U.S. Department of Housing and Urban Development. HOME funds are provided to fill a gap in development funds for marginal risk projects. HOME funds are generally offered by DeKalb County as conditional loans to property owners for the rehabilitation of substandard rental properties to provide housing that will be affordable to low and moderate-income households of DeKalb County.   Funds may also be made available under limited circumstances for new construction or acquisition with special assurances to protect the County's interest. Implementation of the HOME Program is a cooperative effort of the Human and Community Development Department (henceforth to be referred to as HCD), other DeKalb County departments, the Housing Authority of the County of DeKalb (henceforth to be referred to as HADC), affordable housing lenders and public and private/nonprofit owners, developers, sponsors, and managers of rental housing in DeKalb County.

### HOME Loan Conditions

HOME funds are available for conditional loans with interest rates and terms to be determined based on the overall financing of the projects and the fulfillment of the County's underwriting criteria (Policies P-17 and F-15), including the provision of firm financial commitments by all other funding sources in the projects.  DeKalb County HOME loans are self-amortizing loans.  Balloon loans and loans where repayment is made from residual cash flow are not considered, except when the loan is required to fill a small financing gap in a project that serves one of the County's priority needs.   The terms of all loans shall be for a period based upon the HOME mandated minimum affordability period (5-20 years; Policy R-5) or the term of the HOME loan, whichever is longer.  All loans will be evidenced by a Promissory Note and secured by a Deed to Secure Debt and other instruments as needed (Policy P-13-A).

HOME funds provide gap financing.  Funding for approved projects is limited to the amount required to fill the gap between development costs and financing from conventional, developer and other non-HOME sources.  Thus, HOME funds applicants (except applicants submitting LIHTC applications for the same project) must provide proof of firm financial commitments from all non-HOME sources. All HOME approved projects proposed by nonprofit or public applicants are limited to receiving HOME funds in an amount not to exceed 50% of the total eligible acquisition and rehabilitation construction cost of the project.  In most instances, for-profit developers will be limited to 15% of the total project cost (Policy P-18).

# APPLICATION PROCESSING AND PROJECT IMPLEMENTATION PROCEDURES AND REQUIREMENTS

All applications must be received on or before the published submission date (Policy P-5). Each applicant for HOME assistance must submit a non-refundable application fee of $200 to help defray the review and underwriting analysis cost. Application review and analysis is a three-step process as shown below. Funding denial may occur at any point in the process.

## Step 1: Initial Application Review

HCD staff will conduct an initial application review to determine if the application warrants further consideration. Applications that are late, incomplete, or fail to meet minimum threshold requirements (see Procedural Requirements and Policies in Attachment A) will be rejected and returned to the applicant for completion and possible re-submission. Applicants will be notified within 30 days of submission if their application is to be given further consideration or rejected. Applications may be given provisional status pending submission of additional information or clarification identified in the notification, at the discretion of the HCD Director.

HCD will accept and process only those applications that are complete and contain the following Initial Application Review Supporting Documentation (as applicable). **Four copies** of these documents should be submitted in a loose-leaf notebook with tabs numbered to correspond with the document as indicated. A brief description of these documents can be found in Attachment B.

## Required Documents

| Document and Policy Number | Form No. | Tab No. |
|---|---|---|
| Application | Form 100 | 1 |
| Resumes of all development team principals (O/D-1) | | 2 |
| Experience Summaries for Owner & Developer (O/D-1) | Form 105 | 3 |
| Ownership Entity Organizational Documents (O/D-1) | | 5 |
| Financial Statements and Tax Returns (O/D-1) | | 6 |
| Annual Operating Expense Budget (P-19) | Form 125 | 7 |
| Sources of Funds (F-4) | Form 130 | 8 |
| Sources and Uses of Funds (F-4) | Form 135 | 9 |
| 15-Year After-Tax Income Projections (F-5) | Form 140 | 10 |
| Evidence of Site Control/Proof of Ownership (O/D-4) | | 12 |
| Neighborhood and Community Maps | | 14 |
| Project Management Information Summary (O/D-2) | Form 121 | 16 |
| Interior, Exterior and Aerial Photographs | | 18 |
| Financing Letters of Intent & Section 3 Plans | | 21 |
| Equity Investment Letter (F-11) | | 22 |
| Other Lender Packages (P-3) | | |
| Actual Operating Statements for Last Two Years (P-19) | | |

| Document and Policy Number | Form No. | Tab No. |
|---|---|---|
| Nonprofit Eligibility Questionnaire (O/D-1) | Form 110 | 25 |
| Rent Register Form (R-6) | Form 115 | 26 |
| Building/Unit profiles (R-12) | Form 116 | 27 |
| Owner/Developer Agreement | | 28 |
| Utility Allowance Documentation (R-8) | | 29 |
| Rehabilitation Assessment/Scope of Work (O/D-5) | | 30 |
| Certificate of Handicapped-Accessible and Equipped Units (R-2) | | 33 |
| Owner/Housing Authority Tenant Priority Agreement | | 36 |
| Application Preference Documentation | | 38 |

## Step 2: Project Assessment-County Policies and Preferences

HCD staff will assess the application materials and supporting documentation to determine adequacy of information and compliance with all procedural requirements, policies and HUD regulations.

During this phase, the Housing Authority will perform a limited physical assessment of the property and the construction proposals to obtain a preliminary determination of project cost reasonableness and required scope of work. Their limited findings and recommendations will be reported to HCD.

It is the responsibility of the Developer and contractor to guarantee compliance with the County's HOME written rehabilitation standards. For new construction, all HOME units must comply with all necessary HUD property standards, energy conservation standards, and local building, zoning, and construction codes.

Preference in funding will be given to eligible applications that demonstrate the priority attributes shown in Attachment C, "Funding Priorities".

## Step 3: Project Underwriting in Compliance with all HUD and County Criteria

HCD will apply the County's underwriting criteria (see Policy F-15) to assess  the information provided in Form 130 (Proposed Sources of Funds), Form 135 (Sources and Uses of Funds), Form 140 (Fifteen Year After Tax Income Projections), Form 125 (Proposed Annual Operating Budget), Form 100 (Rent Schedules), and other applicable information.

The County's Underwriting Criteria are as follows:

| | |
|---|---|
| Debt Coverage ratio (for senior debt) | 1.25 – 1.30 |
| Debt Coverage ratio (for all debt) | 1.05 – 1.15 |
| Annual Revenue Increase | 2% |
| Annual Operating Expenses Increase | 3% |
| Annual Minimum Operating Expense | $4,000 per unit |
| Minimum Operating Deficit Reserves | 4 months total debt service |
| Minimum Replacement Reserves for Rehabilitation | $30.00 per unit per month ($360 per unit per year) |
| Minimum Replacement Reserves for New Construction | $25.00 per unit per month ($300 per unit per year |
| Maximum Loan to Cost Ratio | 92% |
| Maximum Annual Cash-On-Cash Rate of Return | 12% |
| Total Developers' Fees | A maximum of 15% of Total Project Cost, minus the budgeted developer fee and the cost of the land. Developers' fees must be based on reasonable costs as outlined in the attached Developers' Fee policy. |
| Minimum Equity Investment | At least 8% of project costs if a for-profit Developer (based on an underwriting analysis conducted by DeKalb County). |

If the following documents are not included in the initial application, the applicant must submit the documents within 30 days of the initial application submission.  Except in situations where the applicant will submit LIHTC applications for the same projects, application assessment will not continue until HCD receives the information shown below.

| Document and Policy Number | Form No. | Tab No. |
|---|---|---|
| Experience Summaries of Property Manager | 106 | 4 |
| Market Study | | 11 |
| Zoning Confirmation Letter | | 13 |

| Document and Policy Number | Form No. | Tab No. |
|---|---|---|
| Neighborhood and Community Maps | | 14 |
| Management Agent Questionnaire | 120 | 15 |
| Project Management Information Summaries | 121 | 16 |
| Management Plan and Proposed Lease Form | | 17 |
| Affirmative Marketing Plan | | 19 |
| Section 3 Outreach Plan | | 20 |
| Owner Developer Agreement | | 28 |
| Design Specifications | | 31 |
| Evidence of Project Subsidies | | 32 |
| Certificate of Handicap Accessible and Equipped Units | | 33 |
| Special Needs Service Provider Agreement | | 34 |
| Supportive Services Self Sufficiency Plan | | 35 |
| Energy Standard Certification | | 37 |
| Firm Financing Commitments (F-2) | | 39 |
| Proposed Management Agreement (O/D-2) | | 40 |
| Appraisal (O/D-3) | | 41 |
| Environmental Reports (R-10) | | 42 |
| Temporary Relocation Plan (P-9) | | 43 |
| Contractor's Qualification Statement (P-14) | AIA Form A305 | 44 |
| Soils Report | | 45 |
| Schedule of Values (O/D-5) | | 46 |
| Construction Work Schedule (O/D-5) | | 47 |
| Proposed Owner/Architect Agreement | AIA Form | 48 |
| Proposed Owner/Contractor Agreement (P-14, P-21) | AIA Form | 49 |

Before DeKalb County can make a firm financial commitment of HOME funds, the applicant must submit proof of a firm financial commitment for all developer equity investments, tax credit equity investments, firm debt commitments, and any governmental funding sources to the County for inclusion in their HOME gap analysis and final determination that the HOME money is the last money in the project and the least amount necessary to trigger the other investment(s) in the proposed project.

In addition, any projects that seek government financing other than DeKalb County HOME funds will undergo a subsidy layering analysis as required by HUD. The County HOME staff will use the HUD Multi-Family Underwriting Template to determine the existence and size of the HOME assisted gap.

If the Applicant's proposed financial structure meets all DeKalb County underwriting criteria and related policies, a firm funding commitment letter may be sent to the Applicant with a copy to the Housing Authority. This letter will outline the proposed loan amount, terms, and any contingency issues that must be addressed before HOME funds can be actually disbursed. Please note: HOME loans are self-amortizing. **Loans terms will not include balloon payments and repayment from residual cash flow, unless the loans are necessary to fill a financing gap in a project that fills a County priority need.**

Before issuance of this letter, the Housing Authority will conduct a property inspection for the purpose of determining the adequacy of the proposed scope of rehabilitation and cost estimates if the project is proposing rehabilitation rather than new construction.    To accomplish this, a representative of the Housing Authority will notify the owner and schedule an appointment for the inspection of the property.   This inspection will be conducted by Housing Authority staff and may include DeKalb County or municipal code enforcement officials.  A list of code violations and local property standard deficiencies will be completed and provided to the property owner.  This list is intended to be comprehensive; however, if additional code violations or property standard deficiencies are cited at a later date, the owner will be responsible for making the necessary corrections (Policy R-11).

The Housing Authority will inform the Owner and HCD of any deficiencies in the scope of work and specifications.  Using the list of code violations and property standard deficiencies as a reference, the property owner will prepare and submit a revised scope of work and cost estimate of the proposed repairs.  This will include the necessary work to correct substandard conditions, make essential improvements, and repair major housing systems in danger of failure so that, when the rehabilitation is completed, the property will comply with the applicable local housing codes and property standards.

If necessary, the owner will submit a revised/corrected application package or appropriate portions thereof.  Upon acceptance and approval of the revised information, the Housing Authority will schedule a meeting with the Owner and HCD to review the requirements and schedule for bidding and awarding construction contract and loan closing.

## Application Procedures and Requirements for Housing Authorities

Projects in which the Housing Authority or its nonprofit subsidiary has an ownership interest may be considered for grants rather than loans. The determination of a grant versus a loan will be based on underwriting and gap analysis by HCD.    The Housing Authority will oversee the construction procurement and rehab process just as in other HOME-funded projects.  HCD will monitor these projects for ongoing HOME compliance issues just as the Housing Authority does for other projects.  This will include reviewing and granting prior approval for rent increases, annual on site monitoring of each project, and implementing a monthly/quarterly reporting system.  This will also include conducting unit inspections.  The Housing Authority will manage the project during construction and carry out all Davis-Bacon requirements during that time.

The Housing Authority, or its non-profit subsidiary, must submit the following information to HCD in order to be approved for funding:

- Comprehensive Project Description
- Sources and Uses Budget (Form 135)
- Sources of Funds (Form 130)
- Annual Operating Budget (Form 125)
- Building/Unit Profile (Form 116)
- Rent Register (Form115)
- Home Income Certification (Form 117)

- After Tax Income Projection (Form 140)
- Management Agent Questionnaire (Form 120)
- Social Services Plan for the Residents
- Comprehensive Work Scope with itemized cost breakout
- Phase I Environmental Assessment

As with other applicants, this information may be submitted in another format as long as all of the required details are provided.  HCD staff will evaluate the project to determine the necessity of providing HOME funds, the form of assistance, the appropriate level of assistance, and the appropriateness of proposed rents.

When the Housing Authority is a joint venture partner with a for-profit developer, the HOME request will be treated as a for-profit HOME project, subject to all the applicable rules and regulations.

# POST-AWARD PROCEDURES

## Loan Closing and Construction Monitoring

The Housing Authority will obtain bids for construction. Additionally, the attorney for the Housing Authority will develop the loan documents and related materials to convey the HOME funding assistance to the owner (Policy P-13).  If the developer elects to select the contractor, the developer must provide proof of cost reasonableness in a form that is satisfactory to DeKalb County prior to loan closing.

The prospective contractors will obtain copies of the bid package from the owner's architect and submit their bids to the Housing Authority.  The Housing Authority will open bids and provide them to the owner with an approved low bidder meeting specifications that is not on HUD's list of debarred vendors.

Pending construction contract award and execution, HADC (with approval from HCD) will schedule and proceed with the loan closing (Policy P-13). The following loan closing supporting documentation must be provided prior to loan closing to HCD.  Four copies of these documents should be submitted in a loose-leaf notebook with tabs numbered to correspond with the document as indicated.  A brief discussion of these documents can be found in Attachment B.

| Document and Policy Number | Form No. | Tab No. |
|---|---|---|
| Site Survey | | 50 |
| Insurance Certificates | | 51 |
| Wood Infestation Report | | 52 |
| Architect's Certificate | | 53 |
| HOME Income Certifications (R-12) | Form 117 | 54 |
| Final Management Agreement (O/D-2) | | 55 |
| Final Owner/Architect Agreement | AIA Form | 56 |
| Final Owner/Contractor Agreement (P-14, P-21) | AIA Form | 57 |
| Certification of Cost Reasonableness | | 58 |

In addition to administering and servicing the HOME loan for the County, the HADC will inspect the progress of the work, monitor for Davis-Bacon wage rate compliance, ensure that any required Section 3 reports are submitted, approve and process all draw requests, and conduct the project close-out. Following construction, the Housing Authority will monitor throughout the loan term to ensure that all compliance requirements are met.

## Property Standards

HOME-funded properties must meet certain minimum property standards.

- State and local standards: State and local codes and ordinances apply to any HOME-funded project regardless of whether the project involves acquisition, rehabilitation, or new construction.

- Model codes: For rehabilitation or new construction projects where there are not state or local building codes, DeKalb County must enforce national model codes.

- Housing quality standards: For acquisition-only projects, if there are no state or local codes or standards, DeKalb County must enforce Section 8 Housing Quality Standards (UCPS).

- Rehabilitation standards: DeKalb County's rehabilitation standards apply to all HOME-funded rehabilitation work. New construction requires compliance with the International Energy Conservation Code.

- Accessibility: All HOME-assisted housing must meet the accessibility requirements of the Fair Housing Act and Section 504 of the Rehabilitation Act of 1973.

- Site and neighborhood standards: The site and neighborhood standards of 24 CFR 983.6(b) apply only to the new construction of rental housing.

**Section 3 Compliance (See Appendix J for detailed information)**

Section 3 is a means to foster local economic development, neighborhood economic improvement, and individual self-sufficiency through housing and community development projects funded whole or in part by the Federal Department of Housing and Urban Development (HUD). The purpose of Section 3 of the HUD Act of 1968 (12 U.S.C. 1701u) as amended by the Housing and Community Development Act of 1992, is to ensure that employment and other economic opportunities generated by certain HUD financial assistance shall, to the greatest extent feasible, and consistent with existing federal, state and local laws and regulations, be directed to low- and very low-income persons, particularly those who are recipients of government assistance for housing, and to business concerns which provide economic opportunities to low- and very low income persons.

Section 3 is the legal basis for providing jobs for residents and awarding contracts to businesses in areas where a project involving construction, demolition, or rehabilitation receives HUD financial assistance from the Community Development Block Grant (CDBG) Program, HOME Program, or Neighborhood Stabilization Program (NSP) in excess of $200,000. Contractors or subcontractors that receive contracts in excess of $100,000 for Section 3 covered projects/activities are required to comply with the Section 3 regulations in the same manner as direct recipients. In the event Section 3 covered project expenditures generate economic opportunities (training, employment or contracts), these opportunities must be directed toward qualified Section 3 residents and Section 3 business concerns.

The purpose of Section 3 preferences is to be results oriented by: 1) encouraging business concerns that are not major sources of employment for low-income persons to increase their employment of these persons when economic opportunities arise from HUD financed construction related projects; and 2) promoting the growth of "profit-making" enterprises owned by low-income persons that substantially employ low-income persons with Section 3 contract awards.

It is the policy of HCD to require its contractors to provide equal employment opportunity to all employees and applicants for employment without regard to race, color, religion, sex, national origin, disability, veteran's or marital status, or economic status and to take affirmative action to ensure that both job applicants and existing employees are given fair and equal treatment.

HCD implements this policy through the awarding of contracts to contractors, vendors, and suppliers, to create employment and business opportunities for residents of DeKalb County. The policy shall result in a reasonable level of success in the recruitment, employment, and utilization of county residents and other eligible persons and business by contractors working on contracts partially or wholly funded with the United States Department of Housing and Urban Development (HUD) monies. HCD shall examine and consider a contractor's or vendor's potential for success by providing employment and business opportunities to County residents prior to acting on any proposed contract award.

Title 24 CFR Part 135 - Economic Opportunities for Low- and Very Low-Income Persons, establishes the standards and procedures this Section 3 Plan is based upon, and is intended to ensure the objectives of Section 3 are met. The full regulation may be found at http://www.access.gpo.gov/nara/cfr/waisidx_03/24cfr135_03.html.

## HOME Compliance Monitoring

When DeKalb County invests HOME funds in rental housing, it incurs an obligation to monitor the HOME-assisted property to ensure that it complies with the HOME requirements that apply throughout the period of affordability, and to ensure that the property is maintained in accordance with applicable property standards.

There are several key HOME compliance areas that DeKalb County monitors during the affordability period, including: HOME rent limits, HOME income limits, property standards, tenant selection, tenant income verification and recertification, affirmative marketing, tenant leases and protections, and unit mix. The HOME regulation specifies the minimum compliance monitoring activities that DeKalb County must perform:

- **Reporting.** DeKalb County must require owners to submit an annual report on rents and occupancy [24 CFR 92.252(f) (2)]. This report provides data to DeKalb County on the affordability requirements that limit occupancy to low- and very low-income households and restrict rents to affordable levels.
- **Property Inspections.** DeKalb County must conduct on-site inspections of assisted properties and units to verify that properties are maintained in standard condition and meet applicable housing quality standards, including lead-based paint notification and ongoing maintenance requirements, if applicable. Property and unit inspections must be done every one to three years, depending on the size of the property [24 CFR 92.504(d) (1)]. Exhibit 7-2, below, specifies the frequency of required on-site visits.
- **Record-Keeping.** DeKalb County must maintain sufficient records to enable HUD to determine whether DeKalb County has met all HOME requirements [24 CFR 92.508(a)] and must impose appropriate record-keeping requirements on for-profit and non-profit developers and their agents to assist DeKalb County in its obligation to demonstrate HOME compliance [24 CFR 92.504((c)(3)(iv)].
- **Review of Records.** DeKalb County must review records maintained by the owner and/or property manager to verify the accuracy of the owner reports and to ascertain compliance. These on-site visits must also occur every one to three years [24 CFR 92.504(d) (1)]. Exhibit 7-2, below, specifies the frequency of required on-site visits.

| Exhibit 7-2: Minimum On-Site Property Inspection Schedule Total Number of Units in the Property | Minimum Frequency of On-site Inspections |
|---|---|
| 1–4 units | Every three years |
| 5–25 units | Every two years |
| 26 or more units | Every year |

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION
### FIFTEEN YEAR AFTER-TAX INCOME PROJECTIONS

Development Name:  Park City Place

| | Year 1 2014 | Year 2 2015 | Year 3 2016 | Year 4 2017 |
|---|---|---|---|---|
| Total Potential Rent Income | $ 70,884.00 | $ 72,301.68 | $ 807,396.00 | $ 823,543.92 |
| ADD: Other Income | $ 1,594.89 | $ 1,626.79 | $ 18,166.41 | $ 18,529.74 |
| Gross Potential Income | $ 72,478.89 | $ 73,928.47 | $ 825,562.41 | $ 842,073.66 |
| LESS: Vacancy Allowance | $ 7,088.40 | $ 7,230.17 | $ 80,739.60 | $ 82,354.39 |
| Effective Income | $ 65,390.49 | $ 66,698.30 | $ 744,822.81 | $ 759,719.27 |
| LESS: Operating Expenses | $ 40,500.00 | $ 41,715.00 | $ 325,600.00 | $ 335,368.00 |
| Replacement Reserves | $ 3,240.00 | $ 3,337.20 | $ 3,437.32 | $ 3,540.44 |
| Net Operating Income | $ 21,650.49 | $ 21,646.10 | $ 415,785.49 | $ 420,810.83 |
| LESS: Debt Service 1st | $ - | $ - | $ 323,685.24 | $ 323,685.24 |
| Debt Service 2nd | | | $ 43,158.05 | $ 46,316.09 |
| Debt Service 3rd | | | $ 41,719.43 | $ 41,719.43 |
| Debt Service 4th | | | | |
| Debt Service 5th | | | | |
| Cash Flow | $ 21,650.49 | $ 21,646.10 | $ 27,222.77 | $ 9,090.07 |
| LESS: Depreciation | | | | |
| Amortization (Org Exp) | | | | |
| Amortization (Fin Exp) | | | | |
| ADD: Loan Principal Repaid | | | | |
| Replacement Reserves | | | | |
| Earnings Before Taxes | $ 21,650.49 | $ 21,646.10 | $ 27,222.77 | $ 9,090.07 |
| LESS: Income Taxes @ ___ % | $ - | $ - | $ - | $ - |
| Cash Flow After Taxes | $ 21,650.49 | $ 21,646.10 | $ 27,222.77 | $ 9,090.07 |
| ADD: Tax Credits | | | | |
| Total After-Tax Benefits | $ 21,650.49 | $ 21,646.10 | $ 27,222.77 | $ 9,090.07 |

# DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION
## FIFTEEN YEAR AFTER-TAX INCOME PROJECTIONS

Development Name: Park City Place

|  | Year 5 2018 | Year 6 2019 | Year 7 2020 | Year 8 2021 | Year 9 2022 |
|---|---|---|---|---|---|
| Total Potential Rent Income | $ 840,014.80 | $ 856,815.09 | $ 873,951.40 | $ 891,430.42 | $ 909,259.03 |
| ADD: Other Income | $ 18,900.33 | $ 19,278.34 | $ 19,663.91 | $ 20,057.18 | $ 20,458.33 |
| Gross Potential Income | $ 858,915.13 | $ 876,093.43 | $ 893,615.30 | $ 911,487.61 | $ 929,717.36 |
| LESS: Vacancy Allowance | $ 84,001.48 | $ 85,681.51 | $ 87,395.14 | $ 89,143.04 | $ 90,925.90 |
| Effective Income | $ 774,913.65 | $ 790,411.92 | $ 806,220.16 | $ 822,344.57 | $ 838,791.46 |
| LESS: Operating Expenses | $ 345,429.04 | $ 355,791.91 | $ 366,465.67 | $ 377,459.64 | $ 388,783.43 |
| Replacement Reserves | $ 3,646.65 | $ 3,756.05 | $ 3,868.73 | $ 3,984.79 | $ 4,104.34 |
| Net Operating Income | $ 425,837.96 | $ 430,863.97 | $ 435,885.77 | $ 440,900.14 | $ 445,903.69 |
| LESS: Debt Service 1st | $ 323,685.24 | $ 323,685.24 | $ 323,685.24 | $ 323,685.24 | $ 323,685.24 |
| Debt Service 2nd | $ 46,316.09 | $ 46,316.09 | $ 46,316.09 | $ 46,316.09 | $ 46,316.09 |
| Debt Service 3rd | $ 41,719.43 | $ 41,719.43 | $ 41,719.43 | $ 41,719.43 | $ 41,719.43 |
| Debt Service 4th |  |  |  | $ 25,030.67 | $ 25,030.67 |
| Debt Service 5th |  |  |  |  |  |
|  |  |  |  |  |  |
| Cash Flow | $ 14,117.20 | $ 19,143.21 | $ 24,165.01 | $ 4,148.71 | $ 9,152.26 |
| LESS: Depreciation |  |  |  |  |  |
| Amortization (Org Exp) |  |  |  |  |  |
| Amortization (Fin Exp) |  |  |  |  |  |
| ADD: Loan Principal Repaid |  |  |  |  |  |
| Replacement Reserves |  |  |  |  |  |
| Earnings Before Taxes | $ 14,117.20 | $ 19,143.21 | $ 24,165.01 | $ 4,148.71 | $ 9,152.26 |
| LESS: Income Taxes @ ___% | $ - | $ - | $ - | $ - | $ - |
| Cash Flow After Taxes | $ 14,117.20 | $ 19,143.21 | $ 24,165.01 | $ 4,148.71 | $ 9,152.26 |
| ADD: Tax Credits |  |  |  |  |  |
| Total After-Tax Benefits | $ 14,117.20 | $ 19,143.21 | $ 24,165.01 | $ 4,148.71 | $ 9,152.26 |

...um, Eligible & Projected

74

| Unit Type | Number of Units | Net Floor Area | Average Value | Tenant Effective Set-Aside | Maximum Eligible Gross Rent | Utility Allowance | Maximum Effective Net Rent | Monthly Rental Rent | Monthly Subsidy Amount | Rent as Percentage of Max Disposition | Total Annual Rental Revenue | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | MKT | 0 | 0 | 0 | | | 100% | 351,200 | |
| | | | | 50.0% | 808 | 165 | 643 | | | 100% | 38,580 | |
| | | | | 50.0% | 808 | 165 | 643 | | | 100% | 7,718 | |
| | | | | 60.0% | 874 | 165 | 709 | | | 100% | 0 | |
| | | | | 80.0% | 874 | 165 | 709 | | | 100% | 0 | |
| | | | | MKT | 0 | 0 | 0 | | | 100% | 243,200 | |
| | | | | 50.0% | 901 | 226 | 675 | | | 100% | 24,300 | |
| | | | | 50.0% | 901 | 226 | 675 | | | 100% | 32,400 | |
| | | | | 60.0% | 984 | 226 | 758 | | | 100% | 0 | |
| | | | | 80.0% | 1,109 | 226 | 883 | | | 100% | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| | | | | | | | | | | | 0 | |
| **Total** | 74 | 0 | | | 4 person AMI: | | | 2013 | 1468,300 | Atlanta, GA | | $807,396 |

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION
### FIFTEEN YEAR AFTER-TAX INCOME PROJECTIONS

Development Name:

| | Year 10 2023 | Year 11 2024 | Year 12 2025 | Year 13 2026 | Year 14 2027 |
|---|---|---|---|---|---|
| Total Potential Rent Income | $ 927,444.21 | $ 945,993.10 | $ 964,912.96 | $ 984,211.22 | $ 1,003,895.44 |
| ADD: Other Income | $ 20,867.49 | $ 21,284.84 | $ 21,710.54 | $ 22,144.75 | $ 22,587.65 |
| Gross Potential Income | $ 948,311.71 | $ 967,277.94 | $ 986,623.50 | $ 1,006,355.97 | $ 1,026,483.09 |
| LESS: Vacancy Allowance | $ 92,744.42 | $ 94,599.31 | $ 96,491.30 | $ 98,421.12 | $ 100,389.54 |
| Effective Income | $ 855,567.29 | $ 872,678.63 | $ 890,132.21 | $ 907,934.85 | $ 926,093.55 |
| LESS: Operating Expenses | $ 400,446.93 | $ 412,460.34 | $ 424,834.15 | $ 437,579.17 | $ 450,706.55 |
| Replacement Reserves | $ 4,227.47 | $ 4,354.29 | $ 4,484.92 | $ 4,619.47 | $ 4,758.05 |
| Net Operating Income | $ 450,892.89 | $ 455,864.00 | $ 460,813.14 | $ 465,736.21 | $ 470,628.95 |
| LESS: Debt Service 1st | $ 323,685.24 | $ 323,685.24 | $ 323,685.24 | $ 323,685.24 | $ 323,685.24 |
| Debt Service 2nd | $ 46,316.09 | $ 46,316.09 | $ 46,316.09 | $ 46,316.09 | $ 46,316.09 |
| Debt Service 3rd | $ 41,719.43 | $ 41,719.43 | $ 41,719.43 | $ 41,719.43 | $ 41,719.43 |
| Debt Service 4th | $ 25,030.67 | $ 25,030.67 | $ 25,030.67 | $ 25,030.67 | $ 25,030.67 |
| Debt Service 5th | | | | | |
| Cash Flow | $ 14,141.46 | $ 19,112.57 | $ 24,061.71 | $ 28,984.78 | $ 33,877.52 |
| LESS: Depreciation | | | | | |
| Amortization (Org Exp) | | | | | |
| Amortization (Fin Exp) | | | | | |
| ADD: Loan Principal Repaid | | | | | |
| Replacement Reserves | | | | | |
| Earnings Before Taxes | $ 14,141.46 | $ 19,112.57 | $ 24,061.71 | $ 28,984.78 | $ 33,877.52 |
| LESS: Income Taxes @ ___% | $ - | $ - | $ - | $ - | $ - |
| Cash Flow After Taxes | $ 14,141.46 | $ 19,112.57 | $ 24,061.71 | $ 28,984.78 | $ 33,877.52 |
| ADD: Tax Credits | | | | | |
| Total After-Tax Benefits | $ 14,141.46 | $ 19,112.57 | $ 24,061.71 | $ 28,984.78 | $ 33,877.52 |

## DEKALB COUNTY HOME MULTIFAMILY AFFORDABLE HOUSING ASSISTANCE APPLICATION
## FIFTEEN YEAR AFTER-TAX INCOME PROJECTIONS

Development Name:

| | Year 15 2028 |
|---|---|
| **Total Potential Rent Income** | $ 1,023,973.35 |
| ADD: Other Income | $ 23,039.40 |
| **Gross Potential Income** | $ 1,047,012.75 |
| LESS: Vacancy Allowance | $ 102,397.34 |
| **Effective Income** | $ 944,615.42 |
| LESS: Operating Expenses | $ 464,227.74 |
| Replacement Reserves | $ 4,900.79 |
| **Net Operating Income** | $ 475,486.88 |
| LESS: Debt Service 1st | $ 323,685.24 |
| Debt Service 2nd | $ 46,316.09 |
| Debt Service 3rd | $ 41,719.43 |
| Debt Service 4th | $ 25,030.67 |
| Debt Service 5th | |
| | |
| **Cash Flow** | $ 38,735.45 |
| LESS: Depreciation | |
| Amortization (Org Exp) | |
| Amortization (Fin Exp) | |
| ADD: Loan Principal Repaid | |
| Replacement Reserves | |
| **Earnings Before Taxes** | $ 38,735.45 |
| LESS: Income Taxes @ [ ]% | $ |
| **Cash Flow After Taxes** | $ 38,735.45 |
| ADD: Tax Credits | |
| **Total After-Tax Benefits** | $ 38,735.45 |

num. Eligible & Projected



74

| Unit Type | Average # of Unit | Net Proc Area | Sec Area | % of Elderly Median | Maximum Eligible Gross Rent | Utility Allowance | Maximum Eligible Net Rent | Monthly Subsidy Amount | Rent as Percentage of Fair Mkt Rent | Total Annual Rental Revenue | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | MKT | 0 | 0 | 0 | | 100% | 361,200 | |
| | | | | 50.0% | 808 | 165 | 643 | | 100% | 58,560 | |
| | | | | 50.0% | 808 | 165 | 643 | | 100% | 7,716 | |
| | | | | 50.0% | 874 | 165 | 709 | | 100% | 0 | |
| | | | | 80.0% | 874 | 165 | 709 | | 100% | 0 | |
| | | | | MKT | 0 | 0 | 0 | | | 348,200 | |
| | | | | 50.0% | 901 | 226 | 675 | | 100% | 24,350 | |
| | | | | 50.0% | 901 | 226 | 675 | | 100% | 32,400 | |
| | | | | 80.0% | 994 | 226 | 768 | | 100% | 0 | |
| | | | | 80.0% | 1,109 | 226 | 883 | | 100% | 0 | |
| | | | | | | | | | | 0 | |
| | | | | | | | | | | 0 | |
| | | | | | | | | | | 0 | |
| | | | | | | | | | | 0 | |
| | | | | | | | | | | 0 | |
| | | | | | | | | | | 0 | |
| | | | | | | | | | | 0 | |
| | | | | | | | | | | 0 | |
| | | | | | | | | | | 0 | |

Total   74   0

4 person AMI:

$907,396

ORIGINAL

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA



MARGARET JONES & ASSOCIATES     )
and MARGARET HYLTON JONES,      )
                                )
            Plaintiffs,          )
                                )      CIVIL ACTION 3 CV 79479
        v.                       )      FILE NO. 2003CV_____
                                )
                                )      JURY TRIAL DEMANDED
PERRY HOMES REDEVELOPMENT,      )
LLC, STEVE BROCK, CARL DRURY,   )      ┌─────────────────────┐
NOEL KHALIL, RICHARD WHITE      )      │   FILED IN OFFICE    │
and THE ALISIAS GROUP,          )      │                     │
                                )      │    DEC 2 3 2003      │
            Defendants.          )      │ DEPUTY CLERK SUPERIOR COURT │
                                        │    FULTON COUNTY, GA │
                                        └─────────────────────┘

**VERIFIED COMPLAINT**

Plaintiffs bring this Verified Complaint against Defendants, showing

as follows:

**Parties, Jurisdiction, and Venue**

1.

Plaintiff Margaret Hylton Jones is a resident of DeKalb County,

Georgia, residing at 1472 Brianwood Road, Decatur, Georgia 30033. She is

President of Plaintiff Margaret Jones & Associates. ("Margaret Jones" in this

Complaint refers collectively to Plaintiffs Margaret Jones & Associates and

Margaret Hylton Jones.)

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

MARGARET JONES & ASSOCIATES
and MARGARET HYLTON JONES,
                                            Plaintiffs,

v.                                                              CIVIL ACTION
                                                                FILE NO. _____
PERRY HOMES REDEVELOPMENT,
LLC, STEVE BROCK, CARL DRURY,
NOEL KHALIL, RICHARD WHITE
and THE ALISIAS GROUP,
                                            Defendants.

SUMMONS

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned and required to file with the Clerk of said court and serve upon the
Plaintiff's Attorney, whose name and address is:

        Richard L. Robbins
        SUTHERLAND ASBILL & BRENNAN LLP
        999 Peachtree Street, N.E.
        Atlanta, Georgia 30309
        (404)853-8000

an answer to the Complaint which is herewith served upon you, within 30 days after the service
of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by
default will be taken against you for the relief demanded in the Complaint.

This 2ⁿᵈ day of ___Dec___, 20 83

                                            JUANITA HICKS, Clerk
                                            Fulton County Superior Court

                            By _____
                                            Deputy Clerk

To Defendant upon whom this petition is served:

This copy of Complaint and Summons was served upon you _____ 20___.

                            _____
                                            Deputy Sheriff
                    **ORIGINAL**